**STATLER INDUSTRIES, INC. (Statler Tissue Company), Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 80–1455.**

United States Court of Appeals, First Circuit.

Argued Jan. 7, 1981.

Decided March 12, 1981.

---

David G. Hanrahan, Boston, Mass., with whom Paul J. Kingston, Kingston & Gar-

rett, and Gilman, McLaughlin & Hanrahan, Boston, Mass., were on brief, for petitioner.

Richard Michael Fischl, Atty., Washington, D. C., with whom William A. Lubbers, General Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, BOWNES and BREYER, Circuit Judges.

COFFIN, Chief Judge.

This petition by Statler Industries, Inc. (Statler Tissue Company) to review a National Labor Relations Board order[1] and the Board's cross-application for enforcement raise issues concerning the supportability of findings of violations of Sections 8(a)(1) and (3) of the National Labor Relations Act and the appropriateness of remedy.

The company manufactures household paper products, having its central office and headquarters in Medford, Massachusetts, and a mill in Augusta, Maine, employing some 500 people, of whom approximately a dozen were office employees. The present litigation arises out of efforts by the United Paperworkers International Union, AFL–CIO to unionize the office workers[2], beginning in August 1976 and extending to May 1977.

Based on incidents occurring in December of 1976 and in May of 1977, the Board found that the company, through the coercive conduct of six of its supervisors, had violated § 8(a)(1) in no fewer than ten ways. In arriving at this result the Administrative Law Judge exercised considerable selectivity, dismissing in their entirety charges of coercive conduct on the part of three supervisors and dismissing particular charges attributed to four others.

**1.** Reported at 244 N.L.R.B. No. 19.

**2.** The union had represented all production employees during the prior 8½ years the company

## THE SUPERVISOR ISSUE

The company's defenses are not only thin but leave many a salient undefended. Its first effort is to challenge the supervisory status of four of the persons charged with exercising coercion. The status of three supervisors (LaPointe, Levesque, and Lord) is nowhere put in issue. Of those selected for criticism, one (Poulin) is one of the supervisors the charges against whom the ALJ dismissed. Of the other three, the company recognizes that as to one, Greenlaw, there was specific testimony that he had the power to hire; the company's only argument is that the ALJ should have believed other witnesses. As to the other two, Jones and Bernier, there is ample evidence of supervisory, training, and disciplinary responsibilities, including that of making generally relied upon recommendations for hiring.

## SECTION 8(a)(1) VIOLATIONS

The Board found that one or more of the six supervisors had engaged in the following conduct: threatening employees with reprisals if they associated with union activists; creating the impression of surveillance; threatening to discharge employees who signed union cards; encouraging an employee to withdraw her union authorization card; interrogating employees; promising benefits to employees; changing working hours; instituting a new non-mingling rule; creating other less favorable working conditions; and prohibiting the discussion of salaries.

Of these ten violations, the company has something to say about only two. It criticizes the finding that supervisor Greenlaw created the impression of surveillance and urges that Greenlaw's neutral characterization of his motives be accepted, rather than the credited testimony of an employee. Even more vulnerable is the criticism of the finding that the company engaged in the impermissible interrogation of employees.

had owned the mill. It had also just been certified, following a consent election, as bargaining agent for a few laboratory employees.

Although the Board found that four supervisors had engaged in this activity (Bernier, LaPointe, Levesque, and Lord), the company directs its criticisms against findings relating to only two (Lord and LaPointe). Once again, its only contribution is that the supervisor should have been credited, not the subordinate. We are left with the observation that we cannot fathom why the company deemed it worth the investment to erect this kind of perforated dike against the § 8(a)(1) charges.

## THE DISCHARGES

The Board also found the company in violation of § 8(a)(3) of the Act in that, first, it wrongfully discharged three employees, Harwood, Hanley, and Hill, and second, it wrongfully discharged nine employees by relocating certain office jobs from Augusta, Maine, to Medford, Massachusetts. Both issues are somewhat closer than those we have already discussed.

Our analysis is complicated by the fact that both sets of discharges involve a confrontation of an impermissible motive to get rid of reputed union activists, or to frustrate the union organizing campaign by relocating the office functions, and a permissible motive to discharge for reasons of reorganization and poor performance, or to relocate pursuant to a longstanding plan. We have set forth our approach to such dual motive cases in *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666 (1st Cir. 1979), requiring the Board to demonstrate a " 'significant' improper motiva-

tion" for a discharge and then requiring "the employer to prove that it had a good reason, sufficient in itself, to produce the discharge." *Id.* at 671. In so deciding we accepted as relevant guides the non-labor cases of *Mt. Healthy City Board of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) and *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

In 1980 the Board similarly accepted *Mt. Healthy* as setting the appropriate analytical framework for testing causality in § 8(a)(3) cases in *Wright Line, A Division of Wright Line, Inc.*, 251 N.L.R.B. No. 150. Its statement of the test is as follows:

"First, we shall require that the General Counsel make a *prima facie* showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct [footnote omitted]." Lab.L.Rep. (CCH) ¶ 17,-356, at 32,469 (1980).

We see no difference in formulation between the tests in *Eastern Smelting* and *Wright Line.*[3] It is of course possible that the approaches to each step and the manner in which motives are assessed may dramatically change the coloration of the test, but at present we see *Wright Line* as a conscientious effort to reduce the confusion and discord in dealing with mixed motive cases.[4]

---

**3.** Although our first step in this two step analysis, requires the Board to prove a "significant" anti-union reason, while *Wright Line* in the passage quoted speaks only of "motivating factor", the quotation marks refer to language in *Mt. Healthy* equating "substantial factor" and "motivating factor". 429 U.S. at 287, 97 S.Ct. at 576.

**4.** The company argues at length that we differ from *Wright Line* in requiring the Board to shoulder the burden of proving that there would have been no discharge but for an employee's protected activity. While in cases antedating *Eastern Smelting*, we have used such a formulation, our unequivocal adoption in that case of the *Mt. Healthy* test is determinative. Our subsequent decisions have either

reaffirmed our position, *Texas Instruments Inc. v. NLRB*, 599 F.2d 1067, 1073 (1st Cir. 1979), or have dealt with cases that have not involved a weighing of good and bad reasons but rather an absence of any improper reasons, as in *NLRB v. Wilson Freight Co.*, 604 F.2d 712 (1st Cir. 1979) and *Keosaian v. NLRB*, 630 F.2d 36 (1st Cir. 1980), or an absence of any legitimate reason, as in *South Shore Hospital v. NLRB*, 630 F.2d 40 (1st Cir. 1980). In retrospect we do view as erroneous the last sentence of our opinion in *NLRB v. Borden, Inc., Borden Chemical Division*, 600 F.2d 313 (1st Cir. 1979), where we assigned the burden to the Board of establishing that the employer would not have taken an action but for an improper motivation, citing *Eastern Smelting*, 598 F.2d at 671.

■ Although the Board and we now seem to be on the same analytical track in what has been a vexing area, we deal with a record predating our concord. The ALJ decided this case in March of 1979; *Eastern Smelting* was issued in May; the Board affirmed the ALJ in August of 1979; and it was not until a year later that *Wright Line* was decided. Under these circumstances, having in mind that the now prescribed burden-shifting approach was not applied, but also that a huge investment of time has already been made, we shall view the evidence as to both § 8(a)(3) issues, the discharges of the three men and the relocation of the office jobs, and ask two questions: would a fair reading permit any other conclusion than that a *prima facie* case of anti-union animus was proven?; and, does the record permit a finding that the company had proven by a preponderance of evidence that the three men would have been discharged and the office jobs relocated when they were, even if there had been no union activity? Our test, thus, is not the normal deferential inquiry whether the record substantially supports the Board's finding, but whether "the record in this case does not admit of the argument that petitioner would have been terminated regardless of her [protected activity]." *Givhan, supra*, 439 U.S. at 417 n. 5, 99 S.Ct. at 697 n. 5.

■ We begin with the March 31, 1977 discharges of Harwood, Hanley, and Hill. Our first inquiry is to see whether there is sufficient evidence of significant improper motivation, not based on suspicion or mere anti-union predilection, but based on direct evidence, the circumstances of discharge, or other acts.

While the circumstances of the discharge, involving sixteen others being discharged for various reasons, are perhaps ambiguous, there was direct evidence from former supervisor LaPointe that Harwood, known to have been active for the union since August

of 1976, had been singled out as the principal activist. Other employees had much earlier been warned against associating with him. Incredulous that one man could cause so much activity, company managers sought more names of activists, unsuccessfully at a second meeting, finally succeeding at a third meeting in early February in learning that Hanley and Hill were also involved. LaPointe testified that the three were then listed for termination because of their own union activity. In addition to this direct evidence of animus, there were the numerous threats, interrogations, acts of surveillance, etc. that we have discussed earlier, some of them specifically relating to Harwood and directed to Hanley and Hill. We do not see how, despite Statler's prior generally amicable relationship with the union as to production and laboratory employees, the Board could have come to any other conclusion on this record than that the General Counsel had made a *prima facie* case of discharge for improper motive.

As to each employee discharged, there are different reasons proffered by the company and different countering observations. Harwood, assistant plant accountant, was allegedly fired because he was not qualified for promotion to take over his supervisor's job, and had, during the previous summer, distributed confidential salary information—an act which had led to the adoption of a company rule. But he had worked for the company for 8½ years, had never been disciplined or warned, had received regular pay increases, and his superior LaPointe proclaimed him "adequate" and would have kept him. What the case against Harwood boils down to is that he should have been fired because he was not qualified for a promotion that was yet to be offered[5] and because some months earlier he had done something which if done later would violate a rule. While hardly an overwhelming case, it would be open to the possibility of

---

The page citation there indicates the opposite, the view we now reaffirm.

5. Moreover, this new company standard—of being able to take the number one spot—may rightly be viewed with some skepticism since it resulted in the discharge of only activists Harwood and Hill among the entire work force.

preponderating were it not for the direct evidence that he was the top man on the company's union hit list. This fact is so prominent that we do not see how the Board could have found that the company had carried its burden of proving that Harwood would have been fired even if he had had nothing to do with the union.

Hanley worked half time as a "pulp prep clerk" and half time as a supervisor of production employees[6] in the mill. He had been with the company for nearly four years with no evidence of poor performance. He had been warned to stay away from the office where Harwood worked. The reason given for his discharge was the elimination of his job, another foreman taking over his supervisory duties and a laboratory supervisor taking over his pulp prep duties. Despite his seniority to other production personnel, he was not allowed to take a demotion and return to production work. In light of the total absence of criticism of Hanley, and the absence of any effort to accommodate his seniority, we find the direct evidence of his joining the hit list because of his perceived involvement with union activity compelling.

Finally, Hill, a production and shipping clerk, was discharged allegedly because of his poor performance, being slow and having mental lapses. He was told, however, that the cause of his termination was a "management shuffle". He had worked, receiving regular raises, for the company 4½ years without any disciplinary problems, excepting only one occasion three months earlier when, because of medication, he was sleeping on the job. Later the same month his department manager told him he had an "excellent work record" and "management potential". Two weeks before his discharge his evaluation recorded him as improving. Again, the lack of any evidence of increasing dissatisfaction proximately related to the time of his discharge, together with the cogent evidence of his being listed as a target by company management persuades us that this record could not be viewed as preponderating in favor of a discharge that would have been forthcoming without any connection to union activity.

## THE RELOCATION OF OFFICE EMPLOYEES

We now consider the Board's § 8(a)(3) finding that nine office employees were wrongfully discharged when the company, because of a motive to frustrate union organizational activity, moved their jobs from Augusta to Medford. It is the company's position that a Price Waterhouse study in 1973 recommended centralization of all office functions in Medford, that other economic demands caused the move to be postponed for four years, but that in 1977, with the anticipated renovation of a building in Medford, the plan for moving reached fruition—without impact from any anti-union impulse.

This is the chronology. In May of 1973 the accounting firm of Price Waterhouse & Co. submitted a report to the company recommending the merger of "the accounting departments at the Medford location" of the company's two divisions, Sugarman Brothers and Statler Tissue. This report— or such part of it as in the record—has nothing to say about Augusta office employees. The next relevant communication was from Price Waterhouse in January of 1974, putting forward to the company three proposals for enlisting the help of Price Waterhouse, ranging in fee levels from $120,000 down to $32,000. The proposals included the opaque language that Price Waterhouse "would reorganize and consolidate the accounting functions at Statler

---

**6.** The company argues that Hanley's discharge could not be an 8(a)(3) violation because he was really a supervisor as defined by section 2(11). Not only did the Board supportably find that Hanley's supervisory duties occupied less than half of his time but were exercised in a different location among employees other than those with whom he worked in a non-supervisory status. In sharp contrast to the situation in *NLRB v. Florida Agricultural Supply Co.*, 328 F.2d 989 (5th Cir. 1964), on which the company relies, the separation of Hanley's supervisory and non-supervisory roles was "sharply demarcated". *GAF Corp. v. NLRB*, 524 F.2d 492, 496 & n. 9 (5th Cir. 1975).

Industries, Inc. inclusive of the Augusta facilities." If the company gave instructions to proceed, a "detailed work plan" would be established. So far as the record reveals, no further instructions were forthcoming. In the data constituting what the covering letter called a "work plan", it was specifically acknowledged that the establishment of one central corporate accounting department depended on "a higher level of sales and mix of similar operations". In March of 1974 a "Management Letter" to the company from Price Waterhouse repeated both an interest in meeting with the company's management and the caution that higher sales were a precondition of a merger of all divisional accounting departments.

What followed was silence for the remainder of 1974, 1975, and all of 1976 until December 30. On that date a confidential message was sent by Medford management to the manager of the Augusta plant that the company had decided to move all office and accounting functions to Medford when the new office complex was completed, estimated then to be in June of 1977. The message concluded with the news that Price Waterhouse would do the necessary evaluations within the next month. In fact, no such evaluations by Price Waterhouse appear.

On April 28, 1977, after the firings of Harwood, Hanley, and Hill, and after continued unionization efforts were reported to management on April 20, a notice was posted in the Augusta plant that certain functions were being relocated to Medford and that the renovation of corporate offices was expected by July. Also on April 20, at a management meeting Vice President Lombardi stated that the company would move its Augusta office functions to Medford rather than recognize the union. At another meeting in early May, hastily convened when news of renewed union activity was received, when a colleague cautioned Lom-

bardi that a move during a period of intense union activity might be unwise, Lombardi exploded with expletives aimed at the woman organizer who had been the subject of conversation and saying that she would not frustrate his plans. Although the renovated building was not open for occupancy until December of 1977, the company did not wait for that event but moved most of the Augusta office functions to "old corporate offices" in Medford in July and August. It did not offer jobs or transfer to any Augusta employee, despite the seniority of some and the acknowledged superiority of others.

The ALJ (and the Board) ruled: "Contrary to the contention of Respondent that the move of certain clerical functions to Medford was made pursuant to a long established plan which came to fruition in 1977, I find that the transfer of these jobs was discriminatorily motivated." This conclusion was buttressed by reference to Lombardi's April 20 statement that the company would not have a union in the Augusta accounting department; the fact that the news of renewed union activity brought Medford and Augusta executives together in early May within hours; Lombardi's expletives at that meeting; the firings of Harwood, Hanley, and Hill; the various § 8(a)(1) violations we have noted;[7] the fact that six of the nine office employees discharged were known to be involved with union activities; the fact that none were offered the opportunity to move to Medford; and the dual factors of years of inaction followed by decision in the midst of the union campaign.

 We begin our two-step analysis by holding that the various statements made by Lombardi, the discharges of Harwood, Hill, and Hanley, the numerous threats and interrogations amply make a *prima facie* case of discriminatory motivation. As for the weight to be accorded to the "legitimate

7. It is clear that in considering the events that formed the basis of the earlier § 8(a)(1) charge the ALJ had specifically in mind the teaching of *Local Lodge No. 1424, IAM v. NLRB*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) that events occurring prior to six months before the filing of a charge (September 12, 1977) may not constitute the basis of an unfair labor practice but may be used to shed light on events within the six month period.

business reasons" represented by the Price Waterhouse recommendations, the record forecloses any other reading than that they are too insubstantial to overcome the direct and indirect evidence of a motivation to frustrate union organization of office employees.

A detailed review of the record reveals Price Waterhouse recommendations that at best constitute an invitation to plan. They are directed mainly at Medford operations which were substantially altered when the Sugarman Division was sold. They outlined several approaches involving different levels of Price Waterhouse involvement, leaving the choice up to the company—a choice that was never made. Any action was expressly conditioned on a higher level of sales. Nearly three years passed without a record reference to a single communication referring to the Price Waterhouse proposals.

At the end of December, 1976, a month in which company supervisors had engaged in widespread anti-union threats, interrogations, surveillance and other violations of § 8(a)(1), Medford management communicated in confidence to the Augusta manager its intent to move the office employees when the renovation was expected to be completed in June of 1977. No study led up to this and, despite a reference to Price Waterhouse "evaluations" to be performed during the following month, we are aware of no such work being done. Finally, although the new building did not open for occupancy until December, 1977, the company did not hesitate to post the notice of the move, shortly after learning of renewed union activity, on April 28, 1977, and utilize facilities in Medford which had always been available.

This scenario is unlike that in *NLRB v. Rapid Bindery, Inc.*, 293 F.2d 170 (2d Cir. 1961) and cases cited therein, relied upon by the company for the proposition that a change of operations dictated by sound economic reasons does not violate § 8(a)(3) even though decision may have been accelerated by union activity. In such cases the economic necessity of an imminent change of operations had been made manifest; union demands were merely a factor indicating additional costs. We need not in the case at bar decide whether acceleration of a demonstrably economically justified decision to move an operation because of the desire to avoid further union activity would constitute a § 8(a)(3) violation, for the predicate—the legitimacy and immediacy of the underlying decision—is not established by this fragmentary record.

### THE REMEDY

The company makes a final argument that the Board's remedy in requiring reestablishment at Augusta of the office and accounting jobs that it had relocated at Medford was unwarranted.[8] It asserts that the move was the result of a legitimate business decision—a proposition we have found unsubstantiated; that the relocation produced improvements in operating efficiency—an assertion without any documentation; and that a major capital investment had been made in new office facilities in Medford—another undocumented assertion with no hint as to the absolute or proportionate amount of investment properly allocable to the jobs moved from Augusta. There is not even any indication of the burden facing the company in relocating the positions.

The company has evidently lost sight of the rigorous task facing an employ-

---

**8.** The precise words used in the Board's order were:

"(b) Reestablishment at its Augusta, Maine mill the office and accounting jobs which it relocated at Medford, Massachusetts and offer to the following employees immediate and full reinstatement to their former jobs, or if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or other rights and privileges, and make each of them whole for any loss of earnings they may have suffered in the manner provided in the section herein entitled 'The Remedy.' Francis Harwood, Walter Hill, David Hallee, Shelly Dorr, Lynn Verrell, Arlene Brackett, Normande Beckim, William Nichols, Ellen Kinney, Gerald Boulette and Julia Stevens."

er or court who would set aside a remedy fashioned by the Board: to show that "the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed.2d 1568 (1943). *See also Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964); *NLRB v. Rutter-Rex Mfg. Co.,* 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969).

In such a case as this, where a union organizational effort was found to be aborted intentionally by removing an entire office operation, restoring the status quo ante would seem to be calculated to effectuate the policies of the Act insofar as it would give the union another chance in a fair fight. Space and equipment problems would seem to be minimal. Lacking here is any evidence of unduly burdensome investment such as was required in *Frito-Lay, Inc. v. NLRB,* 585 F.2d 62, 68 (3d Cir. 1978) (reopening of uneconomic plant would cost one million dollars plus operating loss of several hundred thousand dollars a year); *NLRB v. Townhouse T.V. & Appliance, Inc.,* 531 F.2d 826 (7th Cir. 1976) (small TV service company required to buy two trucks); *NLRB v. American Mfg. Co. of Texas,* 351 F.2d 74, 80 (5th Cir. 1965) (employer required to purchase "a new fleet of unwanted trucks"). Nor are there other factors present here which have militated against orders to resume operation: disadvantaging the very employees affected by the employer's action. *Jays Foods, Inc. v. NLRB,* 573 F.2d 438 (7th Cir. 1978); giving a bargaining party unfair advantage, *NLRB v. American Mfg. Co. of Texas, supra*; the lapse of a long period of time prior to resumption; the making whole of injured employees through other means; causing injury to an innocent third party. *See generally* Annotation, Propriety of NLRB Order to Resume Discontinued Operations, 42 ALR Fed. 421.

We venture to require only one modification in the terms of the Board's order, to make explicit what may perhaps be implicit. The "reestablishment" paragraph we have

quoted in note 8, *supra,* contains no proviso recognizing the right of the company to relocate Augusta office functions "at any time in the future if it deems best for business reasons to do so and is not impelled by the intent to deny to its employees the rights conferred by the statute." *NLRB v. Preston Feed Corp.,* 309 F.2d 346, 352 (4th Cir. 1962). Just as we did in a similar situation in *NLRB v. Kelly & Picerne, Inc.,* 298 F.2d 895, 899 (1st Cir. 1962), we retain jurisdiction and return the case to the Board for appropriate revision of the order, after which we shall issue our mandate enforcing it.