863 F.2d 946
 130 L.R.R.M. (BNA) 2033, 274 U.S.App.D.C.
257, 57 USLW 2403,
110 Lab.Cas. P 10,913
 TEAMSTERS LOCAL UNION NO. 171, Affiliated With the
International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of
America, Appellants,
v.
NATIONAL LABOR RELATIONS BOARD.
 No. 87-1522.
 United States Court of Appeals,
District of Columbia Circuit.
Argued Oct. 7, 1988.
Decided Dec. 9, 1988.
 
 Lloyd C. Caudle, with whom, William L. Auten, Charlotte, N.C. was on the brief for petitioner, petitioner A.G. Boone Co.
 Kathleen A. Murray, with whom, Jonathan G. Axelrod, Washington, D.C., was on the brief for petitioner/intervenor, Teamsters Local Union No. 171, affiliated with the Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America. John R. Mooney, Washington, D.C., also entered an appearance for petitioner/intervenor Teamsters Union Local No. 671.
 William R. Stewart, Deputy Asst. Gen. Counsel, N.L.R.B., with whom Aileen A. Armstrong, Deputy Associate General Counsel and Nancy B. Hunt, Atty., Washington, D.C., N.L.R.B. were on the brief for respondent. Collis Suzanne Stocking and Nancy Hunt, Attys., Washington, D.C., N.L.R.B. also entered appearances for the respondent.
 Before EDWARDS, WILLIAMS and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 On September 24, 1987, the National Labor Relations Board ("NLRB" or "Board") issued a Decision and Order finding A.G. Boone Company ("Company") guilty of a number of unfair labor practices in violation of sections 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. Sec. 158(a)(1), (3) and (5) (1982). In particular, the Board found that the Company had refused to bargain in good faith with Teamsters Local Union 171, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 171" or "Union"); had unilaterally changed employees' conditions of employment without first notifying and bargaining collectively in good faith with the Union; had discouraged membership in and activities on behalf of the Union; had interrogated employees concerning their Union activities; and had transferred bargaining unit work, laid off and discharged bargaining unit employees and closed the Company's terminal at Montvale, Virginia in order to take reprisal against employees for engaging in Union activities. The Board ordered the Company to resume operations at the closed terminal and to reinstate its laid-off and discharged employees with backpay. The Board refused, however, to include a visitatorial (information gathering) clause remedy in its final Order.
 
 
 2
 The Union and the Company are now before the court on separate petitions for review: the Union challenges the Board's refusal to include a visitatorial clause remedy in its Order, and the Company challenges the Board's findings of unfair labor practices. The Board has filed a cross-application for enforcement of its Order. With one exception, the Board's judgments are supported by substantial evidence on the record as a whole; therefore, we grant in significant part the Board's cross-application for enforcement and deny for the most part the Company's petition for review. On the Union's petition for review, we remand for further consideration by the Board. We find it unnecessary to decide whether the Company violated section 8(a)(5) when it failed to bargain over the decision to relocate part of its business.
 
 I. BACKGROUND
 
 3
 For many years, the Boone Company has been a contract carrier in the southeastern United States specializing in the transport of groceries and related items. A.G. "Bud" Boone is the owner and president of the Company. Its headquarters and principal terminal are in Charlotte, North Carolina. As a contract carrier, the Company hauls for a limited number of customers, including the Kroger food chain and Kroger subsidiaries, the A & P Tea Company, Winn-Dixie, White House Foods and Chandler Foods.
 
 A. The Board's Findings of Fact
 
 4
 In 1979, the Company opened a terminal in Montvale, Virginia to service a Kroger subsidiary, Westover Dairy, in Lynchburg, Virginia. Eventually, many of the Westover Dairy runs were handled by Montvale drivers. Montvale drivers also hauled some bakery products from Kroger's large bakery at Roanoke, Virginia, until 1986 when the bakery closed; and they hauled fruit juice and other items on backhauls to Kroger's Roanoke suburban warehouse in Salem, Virginia.
 
 
 5
 The Union did not begin any serious effort to organize the Montvale drivers until early 1986. However, well before the advent of a union, employees were warned against union activity. Two Montvale drivers testified that when they were hired in 1981 and 1982, respectively, they were told of Boone's intention to operate the Montvale terminal as a nonunion facility; the Assistant Terminal Manager, Thomas J. "Jack" Dickenson, told them that if a union ever came into the Montvale terminal, it would be closed. The Administrative Law Judge ("ALJ") described this testimony as "credible." Joint Appendix ("J.A.") 927.
 
 
 6
 An election was scheduled for April 13, 1986, when Boone refused to recognize the Union without one. While the election campaign was in progress, Kroger provided the Company with some additional business, approximately 20,000 hauling miles per week, in the form of flower delivery runs from the Kroger warehouse in Simpsonville, South Carolina. The Company assigned about a third of this work to the Montvale terminal but did not hire any additional drivers at Montvale to do the work. J.A. 927-29. However, another driver testified that, about a week before the flower runs were scheduled to begin, the Montvale Terminal Manager, James McGalliard, told him and another driver that if the Union was voted in, "the flowers will be the first thing to go," J.A. 155, and that Bud Boone had already told McGalliard that "he wasn't going to give Local 171 one red cent of his money." Id.
 
 
 7
 In the proceedings before the ALJ, drivers repeatedly testified that members of Company management told them that the Company would close the Montvale terminal if the Union came in. Shortly before the election, Assistant Manager Dickenson told two drivers to "try to talk the Union down because if the Union (was) voted in, Mr. Boone would lock the gate." J.A. 928. Terminal Manager McGalliard told a driver that "if the Union came in, they would close the terminal and he would go back to Charlotte," and was also overheard by one driver telling another driver that "if the Union came in, the drivers would probably be out of a job." Id. Dickenson also told a driver that he knew of five drivers "in on this union deal," and that as soon as he found out who the sixth driver was, he would "fire the s.o.b." Id.
 
 
 8
 Just before the election, McGalliard asked one driver if he knew anything about the "union business." The driver replied that he could not tell McGalliard anything. McGalliard then said that Boone always "seemed fair" to the employees, and it seemed as if the Company treated "you fellows fair." But, he added, "if the [U]nion comes in, I got the lock." Id. Ultimately, the Montvale drivers and maintenance employees nonetheless voted to be represented by Local 171, which was certified by the Board on April 28. J.A. 927.
 
 
 9
 Flower runs from Simpsonville had begun on March 2 as scheduled, but Kroger soon became dissatisfied with the Montvale drivers' deliveries because of problems including damaged flowers and late deliveries. On about April 15, when Kroger decided to forego the hoped-for savings of hauling flowers out of Montvale, the Company began to haul flowers from Simpsonville with drivers from its Anderson, South Carolina, terminal. J.A. 928-29, 942.
 
 
 10
 A few days after the election, however, Dickenson told two different drivers that Montvale drivers would not be handling any more flower runs because the Union had been voted in, and that the Company had transferred the work to the nonunion Anderson terminal because it did not want any union drivers coming into Simpsonville. When one driver said that this sounded like a big joke, Dickenson replied, "You can call it a joke if you want to, but I think it's pretty serious." J.A. 929. In addition, on April 21, the Company reassigned six milk runs per week, going from Kroger's Westover Dairy at Lynchburg to Savannah, Georgia, from Montvale drivers to Charlotte-based drivers. The purpose of this reassignment was to accommodate a new run that the Company had picked up from A & P, hauling food from Charlotte to Greensboro. The dairy runs had amounted to 2,700 miles per week for two Montvale drivers. Id. Shortly thereafter, on May 3, 1986, the Company sent identical letters to the two Montvale drivers with the least seniority, notifying them that they were laid off for lack of work. Id.
 
 
 11
 On about June 13, Kroger closed its Roanoke bakery. Kroger gave the Company only a few days notice of this closing, which depleted the Company's workload. J.A. 930. On June 13, the Company "terminate[d]" the four must junior drivers and one utility man "[b]ecause of a permanent loss of a portion of [the] business at the Montvale facility...." Id.
 
 
 12
 Meanwhile, Company and Union officials met to discuss conditions of employment at Montvale. From the outset, however, Company management indicated an unwillingness to negotiate in good faith with Local 171. In early May, Assistant Manager Dickenson told one driver that Boone would not negotiate a contract with the Union. He said that what was going to take place would resemble the events at a nearby Pepsi Cola plant where the drivers voted to unionize, but the employer had dragged out negotiations for five years without agreeing to a contract. Dickenson then cut himself short, stated that perhaps he had said too much, and walked away. J.A. 930.
 
 
 13
 The first of five meetings between Company and Union officials took place in Roanoke on June 17, just four days after the shutdown of the Kroger bakery and the layoff of the five Montvale employees. Boone opened the meeting by presenting the Union Secretary-Treasurer, Jim Guynn, with a notice that had been posted at the terminal the same day. The notice stated that the Montvale operation would "be closed in the near future" due to the permanent closing of Kroger's Roanoke bakery, that the Company would open a "drastically reduced 'skeleton' " terminal in the vicinity of Lynchburg, and that employees who were interested in working there should sign at the bottom of the notice. J.A. 931-32. Boone made no overture to negotiate over either the decision or the effects of the relocation. Guynn asked Boone how many employees he proposed to transfer to Lynchburg. Boone replied, "Five or six." Boone also indicated that he would offer transfers to Charlotte for four drivers and the rest of the drivers would be terminated. He told Guynn that he had not as yet found a new location in the Lynchburg area but claimed that the closing of the bakery required him to move. J.A. 932. Boone also made it plain that the Company planned to relocate the terminal regardless of anything that the Union might do and indicated that the move would take place in about sixty days. Id.
 
 
 14
 The Company also took unilateral action with respect to changes in its dispatch procedure. Until mid-June, the Company had long followed the practice at the Montvale terminal of posting and allowing drivers to bid on runs, every six months or so, in order of their seniority. The result of this procedure was that most of the drivers had regular runs each week, with the drivers with the most seniority getting their choice of the runs. However, on June 17, without consulting the Union, the Company posted a notice (signed by Terminal Manager McGalliard) that established a new procedure for dispatching drivers. The effect of this new procedure was to abolish the sets of regular weekly runs and to place most runs on an individual rotation basis to be assigned without regard to seniority. J.A. 933-34. When Boone presented a copy of this new procedure to Union representatives at a meeting on June 18, he said it was designed to provide equal earnings for all remaining drivers since the driver making the lowest earnings in any given week would be the first to be assigned a run the following week. J.A. 934. The Union was given no opportunity to bargain over the changes in the dispatch procedure.
 
 
 15
 The Union noted during this June 18 meeting that the Company was now using twelve drivers to operate thirty-three regular runs, plus warehouse runs, and argued that there were more runs currently available at Montvale than there were drivers. The Company made no immediate response to this contention; but, on July 6, the Company recalled two drivers from layoff. J.A. 934. Additionally, shortly before a meeting on July 1, Boone wrote letters to several laid-off drivers, offering them work based out of the Charlotte terminal. Two turned down the offer outright and one ended up with an assignment to the Company's relocated Madison Heights terminal after much discussion with the Terminal Manager. J.A. 934 & n. 8.
 
 
 16
 By telegram on June 27, and again at the July 1 meeting, Guynn protested Boone's instructions to certain drivers to report to Charlotte by June 30, claiming that this was insufficient notice and violated an understanding that Boone had reached with the Union. Boone told Guynn that it was not his intention to require Montvale drivers to relocate to Charlotte so abruptly since the Montvale terminal would be operating for another sixty days. Guynn said that he would never agree to the relocation of Montvale drivers to Charlotte, while the Company was sending Charlotte drivers to Roanoke to perform work that had previously been done by Montvale drivers. He gave Boone a list of the runs in question to support the argument that the Montvale terminal could not operate with only five or six drivers. Boone did not respond to this charge, saying only that he would put up a notice asking drivers if they were interested in transfers to Charlotte or elsewhere within sixty days and stated that the Company would proceed with this change regardless of any Union objections. J.A. 934-35. The parties met again on July 15, but Boone said that he "had no proposals to make because his secretary was on vacation and so he did not have an opportunity to put ... an offer together." J.A. 936.
 
 
 17
 The Company listed the Montvale terminal with a real estate broker in early July, but there is no indication in the record that the terminal was ever sold. Id. The Company did not obtain alternative premises in the Lynchburg area until late July, when it leased part of a shopping center in Madison Heights. On July 24, the Company posted a notice at its Montvale terminal, which stated that the operation was moving to Madison Heights, that there were jobs there for six drivers, that there were jobs for four drivers at Charlotte to handle the Montvale milk runs, and that all other employees were permanently laid off. Id.
 
 
 18
 On August 3, the Union conducted a strike vote. The employees who attended voted unanimously to strike, but the beginning of the strike was postponed about two weeks. Id. After a two-day strike that commenced on August 17, Union Secretary-Treasurer Guynn wrote Montvale Terminal Manager McGalliard a letter requesting "immediate and unconditional reinstatement" for all the strikers. On the same day Boone replied to Guynn in writing, stating that Madison Heights would employ only the three most senior laid-off employees, on condition that there would be no future work stoppages without proper notification; that its Charlotte facility still needed some drivers; and that all other personnel were "placed in permanent layoff." J.A. 936-37.
 
 
 19
 On August 21, Boone sent permanent layoff notices to seven Montvale drivers "due to the reduction in business and the ensuing realign[ment]," effective August 22. The Company accelerated the planned opening of the Madison Heights operation to August 24 in response to the August 17-19 strike at Montvale. Its personnel roster at Madison Heights, as of October 1, included eight drivers and one utility man, all operating under the immediate supervision of former Montvale Assistant Manager Dickenson. Terminal Manager McGalliard was transferred back to Charlotte as a dispatcher. Notwithstanding Boone's assertion that offers of transfers to that location would be made in order of seniority, only two of the drivers who participated in the August strike at Montvale were transferred to Madison Heights. Three senior drivers who participated in the strike were given permanent layoff notices, while employees who worked during the strike and were junior to these three were transferred, either at the same or promoted positions. J.A. 937-38.
 
 
 20
 After the Montvale terminal closed, the Company helped prepare and circulate a petition amongst the Madison Heights drivers seeking the ouster of the Union. The petition was initiated by a driver, but Dickenson, in his new role as Terminal Manager, had the petition typed up, kept it in his office at the Madison Heights terminal, and solicited signatures from employees as they returned from their respective runs. J.A. 938-39.
 
 B. The Board's Legal Conclusions
 
 21
 Based on the foregoing facts, the Board unanimously found that the Company violated section 8(a)(1) of the NLRA[1] by threatening to transfer or discontinue work in reprisal for the employees' union activities; by threatening to close a facility if the employees selected Local 171 as their collective-bargaining representative; by threatening to discharge employees for engaging in union activities; by threatening to refuse to bargain in good faith with Local 171; by interrogating employees about their union activities; by conditioning the reinstatement of striking employees upon the waiver of their section 7, 29 U.S.C. Sec. 157 (1982), rights; and by assisting in the preparation and circulation of an antiunion petition. The Board also unanimously found that the Company violated sections 8(a)(5) and 8(a)(1) of the Act[2] by refusing to bargain over the effects of the layoffs of employees in May and June; by refusing to bargain over the discharge of employees in August; and by unilaterally changing the Company's dispatch procedure. Further, the Board unanimously found that the Company violated sections 8(a)(3) and 8(a)(1) of the Act[3] by unlawfully discharging employees in August and closing its Montvale terminal and relocating its work to Madison Heights. J.A. 993-99, 1002.
 
 
 22
 The Board also found, over one dissent, that the Company violated sections 8(a)(3) and 8(a)(1) of the Act by laying off employees in May and June, and violated sections 8(a)(5) and 8(a)(1) of the Act by failing to bargain over these layoff decisions. The Board further found, with one abstention, that the Company violated sections 8(a)(5) and 8(a)(1) of the Act by failing to bargain over its decision to relocate.[4] Finally, the Board unanimously reversed the ALJ's finding that the Company violated sections 8(a)(5) and 8(a)(1) of the Act by instituting a wage increase in September. J.A. 999-1000, 1002.
 
 
 23
 The Board's Order required the Company to cease and desist from the specified unfair labor practices and from any other means or any other manner of interfering with, restraining or coercing employees in the exercise of the rights guaranteed to them by section 7 of the Act. Affirmatively, the Order required the Company to bargain with the Union; to offer full and immediate reinstatement to the discriminatees and to make them whole for any losses they might have suffered by reason of the discrimination; to reestablish the business operations at Montvale and restore the work formerly performed there by terminated unit employees; and to post an appropriate notice. The Board, contrary to the ALJ, found it unnecessary to order the inclusion of a visitatorial provision. J.A. 951-53, 1000-01, 1005-06.
 
 II. ANALYSIS
 
 24
 Under the Act, we must not disturb the Board's findings of fact when those findings are supported by substantial evidence based on the record considered as a whole. See 29 U.S.C. Sec. 160(e) (1982); Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456, 463-65, 95 L.Ed. 456 (1951); NLRB v. Gateway Theatre Corp., 818 F.2d 971, 974 (D.C.Cir.1987); Pedro's, Inc. v. NLRB, 652 F.2d 1005, 1007 (D.C.Cir.1981). In the instant case, we find that all of the Board's findings of fact (especially those relating to credibility), and most of the Board's legal findings, are clearly supported by substantial evidence based on the record considered as a whole. Thus, we affirm the Board's judgment and remedies except as outlined below.
 
 A. Findings of Unfair Labor Practices
 1. The Section 8(a)(1) Violations
 
 25
 Section 7 of the NLRA, 29 U.S.C. Sec. 157 (1982), guarantees employees "the right to self-organization, ... to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid and protection...." Section 8(a)(1) of the NLRA, 29 U.S.C. Sec. 158(a)(1) (1982), implements this guarantee by making it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7...."
 
 
 26
 An employer may not interfere with employee organizational activities by threatening to close his plant. Textile Workers v. Darlington Mfg. Co., 380 U.S. 263, 274 n. 20, 85 S.Ct. 994, 1001 n. 20, 13 L.Ed.2d 827 (1965). In particular, an employer violates section 8(a)(1) of the Act by threatening to close a facility if the employees select the Union as their collective bargaining representative, Southwire Co. v. NLRB, 820 F.2d 453, 457 (D.C.Cir.1987); by threatening to discharge employees for engaging in union activities, id.; by threatening to refuse to bargain in good faith with a duly certified union, id.; by interrogating employees about their union activities, Midwest Regional Joint Bd. v. NLRB, 564 F.2d 434, 443 (D.C.Cir.1977); Joy Silk Mills, Inc. v. NLRB, 185 F.2d 732, 740 (D.C.Cir.1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951); by conditioning the reinstatement of strikers upon the waiver of their section 7 rights, American Cyanamid Co. v. NLRB, 592 F.2d 356, 361-63 (7th Cir.1979); and by assisting in the preparation and circulation of an antiunion petition, NLRB v. Birmingham Publishing Co., 262 F.2d 2, 7-8 (5th Cir.1959).
 
 
 27
 There is no doubt that substantial evidence supports the NLRB findings here that Terminal Manager McGalliard and Assistant Terminal Manager Dickenson engaged in conduct designed to coerce employees into repudiating the Union. As outlined above, drivers testified about the managers' repeated warnings before the election that, if the Union came in, the terminal would be closed. Management statements also indicated that work would be discontinued or transferred, or employees discharged, as a result of unionization.
 
 
 28
 In addition to these threats, substantial evidence supports the Board's findings that McGalliard interrogated a driver about his union activities, J.A. 928; that the reinstatement of striking workers was conditioned on waiver of their section 7 rights (i.e., requiring the Union to give previous warning before striking), J.A. 937, 948-49; and that the Company assisted and promoted circulation of the antiunion petition at the Madison Heights terminal, and attempted to coerce drivers into signing it, J.A. 938-39.
 
 
 29
 The Company asserts two defenses to these findings. First, it challenges the ALJ's findings of credibility; and second, it contends that the statements did not violate the Act because they were only isolated statements made by minor supervisory employees that did not affect the employees' choice of a collective-bargaining representative. Brief for Appellant at 45-46. We reject both of these claimed defenses.
 
 
 30
 First, under the law of this circuit, it is clear that Board-approved credibility determinations of an ALJ are entitled to be upheld unless they are "hopelessly incredible" or "self-contradictory." Conair Corp. v. NLRB, 721 F.2d 1355, 1368 (D.C.Cir.1983), cert. denied, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984). Because we find the ALJ's credibility determinations to be well within reasonable boundaries, we uphold them.
 
 
 31
 Second, we reject the contention that the statements attributed to the Montvale Terminal Manager and Assistant Terminal Manager should be ignored because these men can only be viewed as "minor supervisory employees." McGalliard and Dickenson were the only Company representatives with whom Montvale employees had regular and sustained contact. It was McGalliard's signature that appeared on the bottom of the June 17 notice to all drivers changing the Company's dispatch procedure. It was McGalliard who offered drivers work in Charlotte in early July. And, it was Dickenson who was appointed Terminal Manager at the newly opened Madison Heights facility after the Montvale terminal was closed. J.A. 937-38. This evidence does not support a claim that the men were merely "minor" supervisors.
 
 
 32
 Moreover, in response to the same assertion that statements uttered by line level supervisors should not be found violative of the Act, this court stated in International Brotherhood of Teamsters v. NLRB, 435 F.2d 416, 417 (D.C.Cir.1970):
 
 
 33
 A rough and ready point made by a supervisor in overalls, the kind of supervisor who is really more naturally engaged in conversation with the workers, may be far more credible and influential so far as the ordinary worker is concerned than a necessarily more formal, structured and purposeful statement of a high-ranking executive.
 
 
 34
 Finally, to the extent that the Company suggests that evidence of actual intimidation is necessary to establish a violation of section 8(a)(1), it is simply wrong. See Southwest Regional Joint Bd. v. NLRB, 441 F.2d 1027, 1031 (D.C.Cir.1970) (finding that the "proper question 'is not whether an employee actually felt intimidated but whether the employer engaged in conduct which may reasonably be said to tend to interfere with the free exercise of employee rights under the Act' " (quoting Joy Silk Mills, supra, 185 F.2d at 743-44)).
 
 
 35
 2. The Section 8(a)(5) and 8(a)(1) Violations
 
 
 36
 Section 8(a)(5) of the Act, 29 U.S.C. Sec. 158(a)(5) (1982), requires that an employer recognize and bargain with a representative chosen by a majority of its employees. Once a bargaining relationship has been established, section 8(a)(5), read in conjunction with section 8(d), 29 U.S.C. Sec. 158(d) (1982), imposes an obligation on both parties to bargain in good faith with a sincere desire to reach agreement. See NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 485, 80 S.Ct. 419, 425, 4 L.Ed.2d 454 (1960); NLRB v. Herman Sausage Co., 275 F.2d 229, 231 (5th Cir.1960). The unilateral implementation of a decision to lay off or discharge employees, or otherwise to change an established term or condition of employment, violates section 8(a)(5) of the Act. See NLRB v. Allied Products Corp., 548 F.2d 644, 652 (6th Cir.1977) ("It is settled law that an employer may not unilaterally change its employees' wages or other working conditions when it is subject to the statutory duty to bargain with a designated representative of its employees.").
 
 
 37
 In the case before us, the NLRB unanimously found that Boone violated sections 8(a)(5) and 8(a)(1) by unilaterally changing its driver dispatch procedure; by refusing to bargain over the effects of the layoffs of employees in May and June; and by refusing to bargain over the discharges of employees in August. We find that these determinations are supported by substantial evidence on the record as a whole.
 
 
 38
 First, the record shows that, in June 1986, the Company unilaterally changed its longstanding dispatch procedure. J.A. 933-34, 947-48. On June 17, without consulting the Union, the Company notified employees that a new dispatch procedure would be implemented beginning June 22. It did not mention this new procedure to the Union until the following day. The ALJ found, J.A. 948, and the Company does not dispute, that the dispatch procedure was a "condition of employment." See section 9(a) of the Act, 29 U.S.C. Sec. 159(a) (1982). Under section 8(a)(5), it is unlawful to change a "condition of employment" without notifying the Union of the proposed change, offering to bargain, and bargaining with the Union in good faith concerning the change. See First Nat'l Maintenance Corp. v. NLRB, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981) (examining what amounts to a "condition of employment"). It is clear that the Company did not fulfill its bargaining obligation to the Union regarding the change in the dispatch procedure, because it did not present the change to the Union as a proposal, but as a fait accompli. The record evidence similarly supports the Board's finding that the Company failed to give the Union an opportunity to bargain over the effects of the layoffs of two employees in May, the effects of the layoffs of five employees in June, and the discharge of seven employees in August. The record shows that the Company acted each time either without notifying the Union at all, or only notifying the Union as it took the action.
 
 
 39
 We offer no view as to whether the Company failed to meet its duty to bargain with the Union when it unilaterally decided to relocate its Montvale terminal. Because, as we explain below, we find that the relocation was discriminatorily motivated and therefore was an unlawful act in violation of section 8(a)(3), we find it unnecessary to decide whether the failure to bargain over the decision amounted to a violation of section 8(a)(5) as well.[5] In particular, we withhold judgment on any issues potentially raised by the facts at hand with respect to the suggestion in First Nat'l Maintenance, supra, that an employer has no duty to bargain over a decision to close part of its business when that decision is motivated by legitimate economic concerns. See also Arrow Automotive Indus. v. NLRB, 853 F.2d 223, 225-27 (4th Cir.1988).
 
 3. The 8(a)(3) and 8(a)(1) Violations
 
 40
 Section 8(a)(3) of the Act, 29 U.S.C. Sec. 158(a)(3) (1982) makes it an unfair labor practice for an employer to discriminate against employees "in regard to hire or tenure of employment or any term or condition of employment to ... discourage membership in any labor organization...." Accordingly, an employer violates section 8(a)(3) of the Act when, in retaliation for employees' union activities, it lays off or discharges employees, NLRB v. Transportation Management Corp., 462 U.S. 393, 398, 103 S.Ct. 2469, 2472, 76 L.Ed.2d 667 (1983); Southwire, 820 F.2d at 459-63, or closes a facility, Carrier Corp. v. NLRB, 768 F.2d 778, 783 (6th Cir.1985).
 
 
 41
 The critical question to be determined is "whether the employer's actions are motivated by anti-union considerations." NLRB v. Berger Transfer & Storage Co., 678 F.2d 679, 691 (7th Cir.1982). Motive is a question of fact, Southwire, 820 F.2d at 459, and the Board may rely on both circumstantial and direct evidence in determining an employer's motive, NLRB v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368 (1941). In inferring that adverse action was taken because of employees' union activities, the Board may consider such factors as the employer's knowledge of the employees' union activities, NLRB v. Proler Int'l Corp., 635 F.2d 351, 356 (5th Cir.1981), the employer's hostility towards the union, NLRB v. Florida Tile Co., 557 F.2d 576, 577 (6th Cir.1977), and the timing of the employer's action, NLRB v. Electric City Dyeing Co., 178 F.2d 980, 983 (3d Cir.1950).
 
 
 42
 In the instant case, the NLRB found that the Company violated sections 8(a)(3) and 8(a)(1) by laying off and discharging employees at its Montvale terminal and by closing the terminal at Montvale and opening a replacement terminal in Madison Heights as a reprisal against the employees for engaging in union activities. J.A. 995-97. It based this decision on the Company's "numerous preelection statements threatening the employees with the closing of the Montvale terminal and a loss of jobs if the Union won," J.A. 995, the same section 8(a)(1) violations we have delineated and affirmed above. The Company asserts, however, that the Board holding should be rejected because of the legitimate economic reasons it had for taking the action it did. The Company points to the reassignment of the dairy runs in April, the termination of the Kroger flower runs in May, and the closing of the Roanoke bakery in June as legitimate economic motives for the layoffs and the closing of the terminal.
 
 
 43
 In reviewing the Board's rejection of the Company's contention that its actions were economically rather than discriminatorily motivated, we apply the Wright Line test used in cases of mixed motive. This test was enunciated in NLRB v. Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), and later upheld by the Supreme Court in Transportation Management Corp., supra. As we have noted:
 
 
 44
 The approach the Board adopted in Wright Line ... requires the General Counsel to "make a prima facie showing sufficient to support the inference that [the employee's participation in] the protected conduct was a 'motivating factor' in the employer's decision." ... Once the General Counsel establishes a prima facie showing, the burden shifts to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.
 
 
 45
 Passaic Daily News v. NLRB, 736 F.2d 1543, 1552-53 (D.C.Cir.1984) (citation omitted) (quoting Wright Line, 251 N.L.R.B. at 1089) (language in brackets added by the court); see also Gateway Theatre Corp., 818 F.2d at 974-75 & n. 6.
 
 
 46
 The Company's early open hostility toward Union activity, and its 8(a)(1) violations, are clearly sufficient to establish a prima facie case that antiunion considerations were a motivating factor in its decisions. Thus, under the Wright Line test, once the General Counsel made this showing, the burden shifted to the Company to prove that it would have taken the same actions even in the absence of the protected conduct. We uphold the Board's findings that neither the June layoffs nor the ultimate closing of Montvale pass the Wright Line test and that, therefore, the Company's actions violate section 8(a)(3) as well as 8(a)(1). However, we reverse the finding that the May layoffs of employees violated section 8(a)(3), because it is not supported by substantial evidence.
 
 
 47
 There is substantial evidence to support the Board's conclusion that the Company "failed to demonstrate a legitimate [business] reason why it decided to operate a scaled-down facility of 8 drivers in Madison Heights, when it was able to continue to operate its Montvale terminal with enough work for 15 drivers [for two months] after the Roanoke bakery closing." J.A. 998. The Board notes:
 
 
 48
 The fact that the Madison Heights terminal is 37 miles closer to Lynchburg than the Montvale facility had been does not establish an economic motivation for the Respondent to close its Montvale facility and reopen a new terminal with only half the work force. It did not suffer a 50-percent reduction in work when the Roanoke bakery closed. One of the ... Respondent's witnesses testified that the actual reduction was approximately 4400 miles per week out of a total of about 33,700 miles per week, or about one-seventh of the overall mileage. The clear alternative explanation for the move is that the Respondent wished to rid itself of the Union at the Montvale location by opening a significantly smaller facility elsewhere, when it employed only two of the employees who had participated in the strike. This conclusion is further supported by the Respondent's action, less than a month after the move, in circulating a petition among the employees disavowing support for or interest in the Union. Accordingly, we conclude the judge was correct in his finding of an 8(a)(3) violation.
 
 
 49
 J.A. 998-99. In view of the context of explicit Company threats to close the Montvale facility in the event of the Union's being certified, and of simultaneous discriminatory layoffs, we believe the Board was entitled to find that the Company failed to establish a Wright Line defense for the relocation.
 
 
 50
 There is also sufficient evidence to conclude that the June layoffs would not have occurred without illegal antiunion animus. These layoffs amounted to a twenty-four percent reduction in workforce in response to only a fourteen percent reduction in its work. J.A. 996. In fact, the Company was forced to recall two of the drivers only three weeks after it made these cuts, evidently because it had too much work to handle without them, further reinforcing the implication that the June cuts were merely another step in the Company's plan to carry out its preelection threats. Id. Nor do the Company's economic records evidence anything but that its asserted economic defense is a mere pretext in this context.[6]
 
 
 51
 However, the Board gives no reasonable explanation for its finding of a violation in connection with the May layoffs. The record indicates substantial business concerns sufficient to prompt the layoff of two employees in early May. The record also reveals that the employees laid off were the two most junior drivers and that they were responsible for the flower runs terminated by Kroger. J.A. 156, 929. Furthermore, the combination of the loss of the flower runs and the transfer of the Savannah milk runs was not offset entirely by the increase in the Roanoke bakery mileage. We find that the Board's reasoning that the transfer of the milk runs, "although not alleged as an 8(a)(3) violation, must be viewed in the context of [the Company's 8(a)(1) violations]," J.A. 995, to be a distortion of the Wright Line doctrine. While it is true that the Company was guilty of "flagrant and continuing" unfair labor practices, J.A. 951, this does not allow the Board to label the May layoffs as discriminatory without conducting any rational inquiry into the Company's business judgments with respect to these particular layoffs. The record clearly supports a finding that the Company would have laid off two employees in May without regard to antiunion considerations. We therefore reverse the finding that the May layoffs violated section 8(a)(3).
 
 B. Remedies
 
 52
 It has long been recognized that in fashioning remedies under the provisions of section 10(c) of the Act, 29 U.S.C. Sec. 160(c), "the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547 (1969); accord United Food & Commercial Workers Int'l Union v. NLRB, 852 F.2d 1344, 1347 (D.C.Cir.1988). The Board's remedial order must therefore be upheld "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." United Steelworkers of America v. NLRB, 646 F.2d 616, 629 (D.C.Cir.1981) (quoting Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)).
 
 
 53
 However, the Board's broad discretion does not give it license to act arbitrarily. Not only must its decision be supported by substantial evidence, United Food & Commercial Workers Int'l Union, Local 152 v. NLRB, 768 F.2d 1463, 1469 (D.C.Cir.1985), it must also be in accordance with announced policies and procedures, Hall-Brooke Hospital v. NLRB, 645 F.2d 158, 160 (2d Cir.1981); United Food & Commercial Workers, 852 F.2d at 1347. Under this standard we uphold the Board's remedial order as far as it goes, but remand for reconsideration of the Union's request for a visitatorial (information gathering) clause.
 
 
 54
 1. Reinstatement, Backpay and Resumption of Operations
 
 
 55
 Having found that the Company discriminatorily closed the Montvale terminal and laid off and discharged many of its employees, the Board determined that the policies of the Act would best be effectuated by ordering the Company to resume the operations at the Montvale terminal and reinstate with backpay its laid-off and discharged employees. J.A. 950. This remedy must be upheld unless the employer can show undue hardship. See, e.g., Statler Indus. v. NLRB, 644 F.2d 902, 909-10 (1st Cir.1981). Indeed, in recognizing that the usual cease-and-desist order and backpay remedies are insufficient to deal with a violation involving a discriminatory closing of a company facility, courts of appeals have upheld restoration orders absent significant mitigating circumstances. See, e.g., NLRB v. Carbonex Coal Co., 679 F.2d 200, 205 (10th Cir.1982); Statler, 644 F.2d at 909-10. Because the Company presented no evidence of undue hardship, the Board clearly acted within its discretion in ordering the reopening of the Montvale terminal.
 
 
 56
 In order to overturn the Board's restoration order, the Company must show that compliance with the order is unduly economically burdensome. See, e.g., Frito-Lay, Inc. v. NLRB, 585 F.2d 62, 68 (3d Cir.1978) (reopening of uneconomic plant would cost one million dollars plus operating loss of several hundred thousand dollars a year). The Company here has not demonstrated that the Board's order would require a substantial outlay of new capital or otherwise cause undue financial hardship. Nor has it established, as it must to have the Board's restoration order overturned, that the order "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." NLRB v. J.H. Rutter-Rex Mfg. Co., 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969) (citation omitted). Thus, we affirm the Board's remedial order as far as it goes.
 
 2. The Visitatorial Clause
 
 57
 The Union contends that the Board abused its discretion in rejecting, in the absence of exceptions, the ALJ's recommended inclusion of a visitatorial (information gathering) clause in the remedial order.[7] The reasons for the ALJ's recommendation were "the flagrant and continuing nature of the [Company's] conduct." J.A. 951.[8]
 
 
 58
 Given that the Board adopted the ALJ's finding that the Company engaged in pervasive violations of the Act, it is not at all clear why the Board simultaneously refused to include a visitatorial clause. The Board merely stated that "such provision is unnecessary," J.A. 994 n. 5, without further explanation. We remand for reconsideration in light of the Board's recent decision in Cherokee Marine Terminal, 287 N.L.R.B. No. 53 (Jan. 28, 1988).
 
 
 59
 Cherokee Marine Terminal explained the Board's reluctance to include visitatorial provisions on a routine basis. Nevertheless, the Board reaffirmed that it would allow such a remedy in appropriate circumstances, such as "when the equities demonstrate a likelihood that a respondent will fail to cooperate or otherwise attempt to evade compliance." Slip op. at 10. In the instant case, the Board adopted the ALJ's finding that "the violations of the Act found herein evidence an attitude on the part of [the Company] to behave in total disregard for the rights of its employees and the obligations imposed upon it by Congress." J.A. 950. We do not see that this conclusion is consistent with an unexplained rejection of the inclusion of the visitatorial clause.
 
 
 60
 We offer no opinion regarding the necessity of a visitatorial clause as a part of the Board's remedial order. This is a matter for the Board to assess in the first instance. Accordingly, we remand to allow the Board to reconsider this matter and to explain its judgment in light of Cherokee Marine Terminal.
 
 III. CONCLUSION
 
 61
 In sum, because we find that most of the NLRB judgments are supported by substantial evidence, we grant in significant part the Board's cross-application for enforcement. We reverse only the finding that the May layoffs of employees violated section 8(a)(3) of the Act, and we remand for reconsideration of the Union's request for a visitatorial clause. We find it unnecessary to decide whether the Company violated section 8(a)(5) when it failed to bargain over the decision to relocate part of its business.
 
 
 62
 So ordered.
 
 
 
 [1]
 Section 8(a)(1), 29 U.S.C. Sec. 158(a)(1) (1982), makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of" their rights under the Act
 
 
 [2]
 Section 8(a)(5), 29 U.S.C. Sec. 158(a)(5) (1982), makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees...."
 
 
 [3]
 Section 8(a)(3), 29 U.S.C. Sec. 158(a)(3) (1982), makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...."
 
 
 [4]
 Because NLRB Chairman Dotson agreed that the relocation decision was unlawfully motivated, he found it unnecessary to pass on the conclusion that the Company violated section 8(a)(5) of the Act by its failure to bargain over the decision to relocate the Montvale terminal. J.A. 1002 n. 1
 
 
 [5]
 To the extent that the Board's opinion can be read to suggest that an 8(a)(5) violation must follow from an 8(a)(3) violation, a judgment on this issue is unnecessary to our decision and thus we make no findings on it
 
 
 [6]
 Indeed, the June layoffs in response to the closing of the Roanoke bakery represented a deviation from past Company practice. The Board referred to the ALJ's finding that the layoffs "occurred without any effort on the part of the [Company] to see if it could obtain additional work as it had in the past." J.A. 996. In his discussion of the June layoffs, the ALJ added that:
 [The Company's] long-term commercial strategy at Montvale was an understandable effort to avoid placing all of its eggs in one basket by relying too heavily upon any one customer or any single source of business to support the terminal. Customers came and went, and there is no record evidence that the [Company] engaged in earlier layoffs when this happened at Montvale.
 J.A. 943.
 
 
 [7]
 A visitatorial clause permits the Board to examine the books and records of a violator of the Act and to take statements from its officers and employees and others for the purpose of determining or securing compliance with a court's judgment
 
 
 [8]
 The recommended visitatorial provision provided:
 For the purpose of determining or securing compliance with this Order, the Board, or any of its duly authorized representatives, may obtain discovery from the [Company], its officers, agents, successors, or assigns, or and other person having knowledge concerning any compliance matter, in the manner provided by the Federal Rules of Civil Procedure. Such discovery shall be conducted under the supervision of the United States Court of Appeals enforcing this Order and may be had upon any matter reasonably related to compliance with this Order, as enforced by the Court.
 J.A. 953.