991 F.2d 1302
 143 L.R.R.M. (BNA) 2131, 125 Lab.Cas. P 10,646
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
World Color Press, Incorporated, Salem Gravure Division,
Intervening Petitioner,
v.
LOCAL 554, GRAPHIC COMMUNICATIONS INTERNATIONAL UNION,
AFL-CIO, Respondent.
 No. 92-2084.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 5, 1993.
Decided April 22, 1993.
 
 Julie Broido (argued), N.L.R.B., Contempt Litigation Branch, Aileen A. Armstrong, Peter D. Winkler, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, Joseph H. Solien, N.L.R.B., St. Louis, MO, for N.L.R.B.
 Thomas D. Allison, Cotton, Watt, Jones & King, Chicago, IL (argued), for Local 554, Graphic Communications Intern. Union, AFL-CIO.
 Thomas C. Walsh, James P. Mannion, Peter H. Harris, Bryan Cave, St. Louis, MO, for World Color Press, Inc., Salem Gravure Div.
 Before BAUER, Chief Judge, MANION, Circuit Judge, and EVANS, Chief District Judge.*
 MANION, Circuit Judge.
 
 
 1
 Local 554, Graphic Communications International Union, AFL-CIO, entered into a labor agreement with World Color Press Inc., Salem Gravure Division. Local 554 then refused to sign the labor contract, claiming disagreement with some of its terms. The National Labor Relations Board (the Board) issued an order requiring Local 554 to sign the contract. The Board now seeks enforcement of that order. Because the Board's factual findings are supported by substantial evidence in the record, and because its legal conclusions are not irrational or inconsistent with the National Labor Relations Act, 29 U.S.C. §§ 151-168 (the Act), we enforce the order.
 
 I. Facts
 
 2
 World Color operates a plant in Salem, Illinois where it prints several magazines, including Good Housekeeping and Cosmopolitan. Local 554 represents a bargaining unit at the plant consisting of about 325 bindery and shipping and receiving employees. That bargaining unit is the subject of the Application for Enforcement at issue.[1] In 1988, Local 554 and World Color executed a labor contract covering the bargaining unit of bindery and shipping and receiving employees for a three-year period--from September 11, 1988 through September 8, 1991. One year into that contract, on September 13, 1989, World Color announced that the company would close the Salem plant on April 1, 1990 unless the company received concessions from the employees at the plant by October 15, 1989.
 
 
 3
 World Color and Local 554 met several times to negotiate possible concessions. On October 14, 1989, World Color presented to Local 554 a proposed new five-year labor agreement. The next day, October 15--the day designated by World Color as the deadline for concessions--the members of Local 554 rejected the company's proposal. Having failed to gain the necessary concessions, World Color announced that it would close the plant on April 1, 1990. The unions representing plant employees then approached World Color about reopening negotiations. World Color agreed to meet with the unions on October 17. At that meeting, Local 554 negotiated slight changes in the company's earlier proposal. The company incorporated these changes into a new proposal, which it presented to Local 554 in written form on October 17. On October 19, the members of Local 554 voted to accept this new labor agreement.
 
 
 4
 In response to the employees' vote, World Color immediately put into effect the new labor agreement and announced that it would not close the plant. The new agreement included wage cuts, a reduction of vacation and holiday time, elimination of personal leave days, cutbacks in insurance coverage, changes in some of the standards related to work practices, changes in overtime procedures, and the creation of a work pool to cut down on overtime pay. Over a period of several months, members of the company asked union representatives to sign a labor contract incorporating the terms of the agreement. The union representatives kept refusing to do so, citing unspecified "errors" in the proposed writing. On March 20, 1990, World Color filed an unfair labor practices charge, claiming that Local 554 violated Section 8(b)(3) of the Act by failing to sign a new contract. The Board dismissed this claim, finding that a provision in the proposed contract subjecting the shipping and receiving department to a "work pool" did not reflect the agreement reached by the parties. The company then revised its contract based on the Board's decision. The new text expressly stated that the "work pool" provisions did not apply to the shipping and receiving department.
 
 
 5
 On April 18, 1990, the company presented the union representative with this revised document. The union representative refused to sign it, again citing unspecified "errors" in the proposed writing. The company then filed this unfair labor practices charge, again alleging that Local 554 violated Section 8(b)(3) of the Act by failing to sign a new contract. Local 554 responded that it had no duty to sign a contract because the parties failed to reach an understanding on several key points; that the document presented for signature did not accurately set forth the agreement; and finally, that it had no obligation to sign the written agreement because the International Union had not yet approved it as required by the contract.
 
 II. Administrative Proceedings
 
 6
 The case initially was presented to an Administrative Law Judge (ALJ) who held an evidentiary hearing. On May 9, 1991, the ALJ issued findings of fact and conclusions of law. He found that the contract World Color submitted to Local 554 for signature on April 18, 1991 accurately reflected the agreement reached by the parties. Based on that finding he concluded that "[b]y failing and refusing to execute the collective bargaining agreement prepared and presented to it for signature on or about April 18, [1990][2], [Local 554] violated Section 8(b)(3) of the Act." The ALJ rejected the union's argument that it had no obligation to sign the contract because it had not been explicitly approved by the International Union. He concluded that Local 554 was foreclosed from making this argument because it never presented the contract to the International for approval and because it received the benefit of the bargain when World Color decided not to close the plant. The ALJ recommended that the Board order Local 554 to sign the April 18 contract.
 
 
 7
 In a 2-1 vote, a 3-member panel of the Board approved and adopted the ALJ's decision. The dissenting panel member concluded that Local 554's failure to gain approval from the International Union nullified the local's obligation to sign the contract. The Board then filed an Application for Enforcement with this court, asking that we enforce its decision. Local 554 opposed this application, making basically the same arguments it made before the ALJ.
 
 III. Standards of Review
 
 8
 We give substantial deference to the Board's decisions because Congress has delegated to the Board "primary responsibility for developing and applying national labor policy." NLRB v. Curtis Matheson Scientific, Inc., 494 U.S. 775, 786, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990); see also Randall Div. of Textron, Inc. v. NLRB, 965 F.2d 141, 144 (7th Cir.1992). Accordingly, we uphold the Board's factual findings if supported by substantial evidence in the record as a whole. 29 U.S.C. § 160(e); Randall, 965 F.2d at 144. "Substantial evidence is evidence that 'a reasonable mind might accept as adequate to support a conclusion.' " Id. (citation omitted). Similarly, we uphold the Board's legal conclusions " 'unless they are irrational or inconsistent with the [Act].' " David R. Webb Co., Inc. v. NLRB, 888 F.2d 501, 503 (7th Cir.1989), cert. denied, 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 743 (1990) (quoting NLRB v. Parents and Friends of the Specialized Living Center, 879 F.2d 1442, 1448 (7th Cir.1989)).
 
 IV. Analysis
 A. Factual findings
 
 9
 The first question, then, is whether substantial record evidence supports the Board's factual finding that the April 18 contract accurately represents the agreement reached by the parties. Local 554 disputes this finding, claiming that the document which the Board has ordered the union to sign differs significantly from the agreement reached by the parties. To make this argument, the union juxtaposes World Color's written proposal of October 17, which the membership agreed to accept, and the April 18 contract. The union details in its brief each instance where the wording of the April 18 text differs from that of October 17. The Board portrays the union's argument as an after-the-fact attempt to justify its refusal to sign the April 18 contract. The Board points out that at no time prior to the evidentiary hearing before the ALJ did the union cite the differences in contract language it now relies upon in refusing to sign the contract. Nor did the union ever present an alternative version of the contract for signature.
 
 
 10
 We need not engage in a complicated factual evaluation of each alleged difference between the October writing and the April 18 contract. The Board presents us with a key factual finding: that the April 18 contract comports with the agreement reached between the parties. To this finding we apply a very deferential standard, asking whether substantial evidence in the record as a whole supports the finding. The best evidence in the record supporting the applicability of the April 18 contract is the October 17 writing setting forth the agreement between the parties. Because the October 17 writing includes the material terms of the April 18 contract, substantial evidence supports the Board's finding that the contract accurately reflects the agreement.
 
 
 11
 The union has not demonstrated how the contract differs materially from the agreement. All the union argues is that the October writing differs in some respects from the April writing. Just because certain words may have been changed to more accurately reflect the parties' intentions does not mean that the later writing fails to properly represent the agreement. To so hold would penalize the company for its efforts in making sure that the terms of the agreement were in writing. It would also preclude the possibility that a contract when finally drafted might be fine-tuned to more accurately effectuate the agreement. The differences between the October writing and the April contract are slight. The similarities, on the other hand, provide substantial evidence that the April contract accurately chronicles the agreement between the parties. We therefore conclude that the Board's factual finding is supported by substantial evidence.
 
 B. Legal conclusions
 
 12
 Having determined that the Board's basic factual finding regarding the applicability of the April 18 contract is supported by substantial evidence, we next turn to the Board's legal conclusion: that the union violated Section 8(b)(3) of the Act by refusing to sign the April 18 contract. According to the standards previously set forth, we must determine whether this legal conclusion is irrational or inconsistent with the Act. If not, we are required to defer to the Board's conclusion.
 
 
 13
 Under Section 8(b)(3) of the Act, it is considered an unfair labor practice for a union "to refuse to bargain collectively" with an employer of its members. 29 U.S.C. § 158(b)(3). Section 8(d) of the Act establishes that the duty to bargain collectively requires "the execution of a written contract incorporating any agreement reached if requested by either party...." 29 U.S.C. § 158(d). Therefore, a union violates Section 8(b)(3) when it refuses to sign a written contract setting forth the agreement reached through the collective bargaining process. See NLRB v. Painters Local 1385, 334 F.2d 729, 730-731 (7th Cir.1964); NLRB v. Electrical Workers, Local 22, 748 F.2d 348, 349-350 (8th Cir.1984). When deciding to apply the Act, the " 'crucial inquiry is whether the two sides have reached an "agreement," even though that "agreement" might fall short of the technical requirements of an accepted contract.' " Capitol-Husting Co. v. NLRB, 671 F.2d 237, 242 (7th Cir.1982) (quoting NLRB v. Donkin's Inn, Inc., 532 F.2d 138, 141 (9th Cir.1976), cert. denied, 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976)). Neither party disputes that they reached an agreement on October 19. We have upheld the Board's finding that the April 18 contract accurately reflects that agreement. Given this factual finding, the legal conclusion is inevitable: Local 554 violated Section 8(b)(3) of the Act by refusing to sign the April 18 contract.
 
 
 14
 The union raises three legal arguments by which it attempts to escape this legal conclusion. First, it contends that the Act does not apply to a mid-term renegotiation of an existing collective bargaining agreement. The Board disagreed, adopting the ALJ's conclusion that "[p]arties to an existing contract have no obligation to renegotiate a contract during the term of that contract but, once they agree to do so, the same legal obligation of incorporating oral understandings into a written signed document comes into play." The union fails to demonstrate how this conclusion is irrational or inconsistent with the Act, and we conclude that it is neither. Section 8(d) extends the duty to execute a written contract to "any agreement reached if requested by either party." 29 U.S.C. § 158(d). A midterm collective bargaining agreement freely negotiated by the parties falls into the broad category of "any agreement." It is fundamentally rational for the Board to facilitate the practice of renegotiation--a practice not objectionable as long as the parties to a contract freely agree to it--by enforcing agreements reached as a result of renegotiation.
 
 
 15
 The union next argues that it had no legal obligation to sign the contract, because World Color failed to provide the required Section 8(d) notices. The Board adopted the ALJ's conclusion that in cases of mid-term renegotiation, "there is no necessity that the conventional notice, required by Section 8(d) to begin negotiations at the end of the contract term, be given to state and federal agencies or to the other contracting parties." In essence, the Board concluded that Section 8(d) applies to termination or modification of a collective bargaining relationship taking place after the natural expiration of the labor contract. It does not apply to circumstances of renegotiation taking place prior to the natural expiration of the labor contract. We need not debate the relative policy advantages of requiring or not requiring such notice in cases of renegotiation. Congress left that task to the Board by conferring upon it the responsibility to formulate national labor policy. The Board has spoken decisively in this case against the need for Section 8(d) notice in circumstances of renegotiation. We defer to the Board's conclusion, finding it neither irrational nor inconsistent with the purposes of the Act. There are good reasons not to require notice where the same exigencies which caused the need for renegotiation might make a prolonged notice period impractical.
 
 
 16
 Finally, the April 18 contract includes a clause conditioning its validity upon approval by the International Union.[3] The union argues that its failure to obtain such approval negates its duty to sign the contract. At least one member of the panel which reviewed this case for the Board thought this was a good argument, and dissented on that basis. The two other members agreed with the ALJ that the union's failure to even submit the contract to the International Union for signature prevents it from relying upon the lack of signature in refusing to sign the contract. The ALJ summarized his reasoning as follows:
 
 
 17
 The existence of a requirement for international approval suggests a correlative duty of due diligence on the part of a local to seek such approval or at least to bring the contract to the attention of the International for its consideration. Whether, for good reason, bad reason, or no reason at all an International may thereafter refuse to approve is not a question in this case because the International herein was never asked.
 
 
 18
 The dilatory tactic of the Respondent in failing to seek international approval, obtaining the benefit of its bargain, and then asserting the failure of the International to approve the contract as a basis for failing to execute the agreement gives rise to an estoppel situation. Accordingly, on the basis of the facts and circumstances of this case, I conclude that the Respondent herein has been estopped from asserting this defense, even though it might have made telling use of this contract requirement had it acted in a timely fashion.
 
 
 19
 Essentially, the Board concludes that the union's dilatory behavior excuses the condition that the International Union sign the contract. Our role in reviewing this conclusion, again, is to determine whether it is irrational or inconsistent with the purposes of the Act.
 
 
 20
 The requirement of International approval is an unmistakable condition to the validity of the contract. The language of the contract is specific: "the Agreement does not become a valid and binding document without the approval of the International President." See supra note 3. The question is whether the union can permanently delay the validity of the contract by refusing to seek International approval. The Board concluded that the union has engaged in such dilatory conduct, and its conclusion is supported by substantial evidence--there is no evidence that the union has ever sought International approval. Does the union's dilatory behavior excuse the condition that the contract be signed by the International? To borrow the observation of one commentator, "[o]nly the law of the jungle would say under such circumstances that [the condition] should not be excused." John D. Calamari & Joseph M. Perillo, Contracts § 11-28, at 486 (3d ed. 1987).
 
 
 21
 The circumstances of this case bear some resemblance to Rohde v. Massachusetts Mutual Life Insurance Company, 632 F.2d 667 (6th Cir.1980). There, a man applied for life insurance, took a physical examination, arranged for payment of the first premium, and was given life insurance contingent upon the company's determination that he was "insurable." The contract clearly stated that the company's approval was necessary and he would have no interim insurance while awaiting that contingency. The same day, the man died of a heart attack and the insurance company determined that he was not insurable on that basis. The court, however, found that the insurance company acted in "bad faith" in assessing the man's insurability. Accordingly, the court excused the condition that the insurance company determine insurability and awarded benefits under the policy.
 
 
 22
 The defendant's good faith determination that the applicant meet the defendant's standard of insurability was a condition precedent to defendant's liability under the contract represented by the conditional receipt. When the defendant acted in bad faith and determined that the applicant failed to meet the defendant's standards, then the defendant's own act prevented the occurrence of the condition precedent. The nonoccurrence or nonperformance of a condition is excused where that failure of the condition is caused by the party against whom the condition operates to impose a duty. Defendant's failure to honor its obligation of good faith in exercising its right to examine the application deprives defendant of any benefit it might obtain from that condition.
 
 
 23
 Id. at 670. (Citations omitted and emphasis added.)
 
 
 24
 The Restatement (Second) of Contracts § 245 (1979), discusses the circumstances by which a party's purposeful non-performance of a contractual condition excuses its performance: "Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused." The union complains that the Board improperly placed the burden on the union to show that it submitted the contract to the International for approval. However, comment b to Section 245 would allow such a shift in burden: "Nevertheless, if it can be shown that the condition would not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-occurrence and the rule does not apply. The burden of showing this is properly thrown on the party in breach."
 
 
 25
 The Rohde case and section 245 illustrate situations where a party's failure to honor its duties to effect a contractual condition excuses the performance of that condition. This case falls squarely within that category; the Board found that the union failed in its duty to seek the International's signature and therefore cannot complain for lack of signature.[4] This conclusion is not irrational. Nor is this conclusion inconsistent with the purposes of the Act. Any other conclusion might encourage the type of dilatory conduct in which the union engaged. The Board could reasonably conclude that such conduct was not proper in this collective bargaining process.
 
 V. Conclusion
 
 26
 Because the Board's findings of fact are supported by substantial evidence, and because its legal conclusions are neither irrational nor inconsistent with the purposes of the Act, the order is
 
 
 27
 ENFORCED.
 
 
 
 *
 Hon. Terence T. Evans, Chief Judge for the Eastern District of Wisconsin, is sitting by designation
 
 
 [1]
 Local 554 also represents 41 photoengraving employees, and another local of the Graphic Communications International Union, Local 780-C, represents approximately 300 pressmen at the plant
 
 
 [2]
 The ALJ's decision inaccurately listed the date of this contract as April 18, 1991 instead of April 18, 1990. The Board corrected this error when it approved the ALJ's decision
 
 
 [3]
 The clause reads as follows:
 INTERNATIONAL APPROVAL
 
 
 [1]
 The terms and conditions of this Agreement are subject to review of the International and the Agreement does not become a valid and binding document without the approval of the International President
 Such approval does not, however, under any circumstances make the International responsible for the observance of this Agreement or of any breach thereof.
 
 
 [4]
 The ALJ's recommendation, which the Board adopted, professed to be based on the principle of estoppel. Although some elements of estoppel are present, this case does not present a classic case of estoppel. However, it is the Board's legal conclusion that we uphold unless it is irrational or inconsistent with the Act. The ALJ's failure to apply the correct label to his sound reasoning does not render the decision irrational