**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The GATEWAY THEATRE CORPORATION d/b/a Senator Theatre, Capitol Hill Cinemas, Respondents.**

**No. 86–1368.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 24, 1987.

Decided May 22, 1987.

As Amended May 27, 1987.

Howard Perlstein, Attorney, N.L.R.B., with whom Robert E. Allen, Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on the brief for petitioner.

Lawrence T. Zimmerman, Washington, D.C., for respondent.

Before EDWARDS, R.B. GINSBURG, and WILLIAMS, Circuit Judges.

Opinion for the Court by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In an unfair labor practice proceeding before the National Labor Relations Board ("NLRB" or the "Board"), it was found that management officials at Gateway Theatre Corporation ("Gateway") had violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1), (3) (1982), by terminating the services of three motion picture projectionists and making an allegedly coercive statement to one of the projectionists. The NLRB ordered Gateway to offer to reinstate the three projectionists, with back pay and full restoration of seniority and benefits. The Board now seeks enforcement of its order.

We are utterly astonished that the Board found violations of the Act on the facts of this case. There is absolutely no evidence in the record that the projectionists' discharges were motivated by anti-union animus, or that the statement made by Gateway's officer was coercive. Rather, the evidence clearly shows that the services of two of the three projectionists were terminated because they were incompetent and had repeatedly violated Gateway's work rules. The third "discharged" projectionist was offered a position with Gateway within three days of the date of "discharge," and, in fact, currently works for Gateway. Because we find that the Board's findings are not supported by substantial evidence, we have no choice but to deny the application for enforcement.

## I. BACKGROUND

In June of 1983, Gateway, a firm with no prior experience running motion picture theaters, undertook the operation of three motion picture theaters in Washington, D.C. On June 16, 1983, Gateway management met with representatives of Local 224 of the Moving Picture Machine Operators' Protective Union (the "Union"), seeking to make arrangements to obtain the services of qualified projectionists. During their discussions, which recognized Gateway's lack of experience in theater management, the parties reached the following oral agreement: "the Union would select and provide all the projectionists needed to staff [Gateway's] theaters; that if [Gateway] had problems with any of the projectionists it would contact the Union which would attempt to resolve the problem with the projectionists; and that [Gateway] would pay the projectionists certain hourly wages and premium pay for work after midnight. They also agreed that this ... arrangement was temporary and that after the expiration of 6 months ... [Gateway] was free to discontinue it entirely." *Gateway Theatre Corp.*, 277 N.L.R.B. No. 186, at 2 (1986) ("Board Op."). Gateway " 'absolutely' had a right to 'walk away' [from the arrangement] for any reason at the end of 6 months." *Id.* at 3 (quoting Union official).

Thereafter, Gateway commenced operation of its theaters. Pursuant to the oral agreement, Gateway notified the Union of

the times at which films would be shown, the Union assigned and scheduled projectionists to meet Gateway's requirements, and Gateway paid the projectionists at the agreed-upon wage rates. "Also pursuant to the agreement, although [Gateway] had numerous disciplinary problems with projectionists, it took no action against [them] but repeatedly complained to the Union about them." *Id.* Some time later, a dispute arose between Gateway and a former projectionist (Hughes) over wages. Although the Union had assured Gateway that it would support Gateway's position at a hearing before the local Wage and Hour Board, the Union sided with Hughes at the hearing. On March 20, 1984, the Wage and Hour Board found that there was no contractual relationship between the Union and Gateway, and ruled in favor of Gateway on Hughes' claim.

That same day, Gateway terminated its relationship with the Union, writing that it had "decided to employ independent projectionists for the immediate future," and asking the Union to so notify any projectionists who would suffer a loss of work. Letter from Gateway to the Union (Mar. 20, 1984), *reprinted in* Joint Appendix ("J.A.") 726. Gateway then hired projectionists, offering lower wages than had been paid under the Union arrangement. Gateway extended an offer to Hunt, one of the Union-referred projectionists, on or about March 23, 1984. He did not accept the offer at that time, but ultimately returned to Gateway at the same terms that he had enjoyed under the Union agreement. Gateway did not make offers to the other Union-referred projectionists. The record does not indicate whether or not the projectionists who were hired to replace the Union-referred projectionists were Union members.

On March 26, 1984, the Union filed a charge against Gateway with the Board. The General Counsel issued a complaint on June 25, 1984. The complaint alleged that: (1) Gateway officials had made certain coercive statements to some of the projectionists in violation of section 8(a)(1) of the Act;[1] (2) Gateway had discharged projectionists Hunt, Blair, Dixon and Marken in violation of sections 8(a)(1) and (3) of the Act;[2] and, (3) by unilaterally reducing the wages of projectionists after March 20, 1984, Gateway had refused to bargain with the Union in violation of sections 8(a)(1) and (5) of the Act.[3]

The matter was heard before an administrative law judge ("ALJ") on September 18, 19 and 20, 1984. The ALJ dismissed the case in its entirety. *Gateway Theatre Corp.*, 277 N.L.R.B. No. 186 (1984) ("ALJ Op."). The ALJ found that, on March 20, "the Company exercised its right to terminate the entire agreement and told the Union to stop 'scheduling' employees on its behalf. It decided to hire projectionists itself." *Id.* at 3. Therefore, no violation of section 8(a)(5) took place when, after March 20, Gateway began paying projectionists wages different from those set by the agreement with the Union. As for the discharge of the four projectionists, the ALJ found that one of them, Marken, had voluntarily left his job at Gateway more than a month before March 20, 1984. Accordingly, it could not be said that he had been discharged as a result of anti-Union animus. The ALJ further found that, with regard to "the three men who lost their jobs on March 20 because the Company chose no longer to have the Union do the hiring, as to two of them—Blair and Dixon—there is a perfectly convincing affirmative defense of discharge for just cause—

**1.** Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1982), makes it an unfair labor practice for an employer to "coerce employees in the exercise of" their rights under the Act.

**2.** Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) (1982), provides in pertinent part:
(a) It shall be an unfair labor practice for an employer—
(3) by discrimination in regard to hire or tenure of employment or any term or condi-

tion of employment to encourage or discourage membership in any labor organization. . . .

**3.** Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5) (1982), makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees."

plain, continuing flouting of the work rules. As to [Hunt], the competent man, the Company offered to keep him." *Id.* at 10. As for the allegedly coercive statements, the ALJ found that one such statement had not been made, based on credibility assessments of the witnesses. However, there was no explicit discussion of an allegedly coercive statement made by Dacey, an officer of Gateway, to Dixon.

The Board agreed with the ALJ that "when [Gateway] terminated its relationship with the Union on 20 March 1984, it was exercising a right created by its agreement with the Union and did not thereby violate Section 8(a)(5) and (1) of the Act. Having lawfully terminated its relationship with the Union, [Gateway] was free to alter terms and conditions of employment without bargaining." Board Op. at 4–5. However, the Board found that, although Gateway had "adequate cause to discharge" Blair and Dixon, and had "made an offer to keep Hunt on as a projectionist about 3 days after the 20 March dissolution of the relationship with the Union," Gateway had discharged Hunt, Dixon and Blair out of anti-Union animus.[4] *Id.* at 8–9. In addition, the Board found that Dixon's testimony concerning Dacey's statement was "uncontroverted" and "[c]learly ... had a tendency to restrain and coerce Dixon in the exercise of his statutorily protected rights." *Id.* at 7. The Board ordered Gateway to offer to reinstate Dixon, Blair and Hunt, to restore their seniority and other rights, and to give them back pay. *Id.* at 11.

## II. ANALYSIS

Under the Act, we must not disturb the Board's findings of fact where those findings are supported by substantial evidence based on the record considered as a whole. *See* § 10(e) of the Act, 29 U.S.C. § 160(e) (1982); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Pedro's, Inc. v. NLRB,* 652 F.2d 1005, 1007 (D.C.Cir.1981). This standard, while deferential, does not represent an abdication of judicial review. We may not "determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justifie[s] it, without taking into account contradictory evidence and evidence from which conflicting inferences could be drawn." *Universal Camera,* 340 U.S. at 487, 71 S.Ct. at 464. Rather, we "must take into account whatever in the record fairly detracts from its weight." *Id.,* at 488, 71 S.Ct. at 464. In the instant case, the Board's findings clearly are not supported by substantial evidence based on the record considered as a whole.

### A. The Section 8(a)(3) Violation

Using the *Wright Line*[5] test for unlawful termination in cases of mixed motive, the Board found that the General Counsel had made out a *prima facie* case of anti-Union motivation in Gateway's discharge of Dixon, Hunt and Blair, and that Gateway had not carried its burden of then showing that the projectionists would have been discharged irrespective of anti-Union considerations.[6] We do not think that the

---

4. The Board agreed with the ALJ that Marken, the fourth named projectionist, had voluntarily left Gateway long before the March 20 incident, and therefore had not been discharged as a result of anti-Union animus. Board Op. at 5 n. 6.

5. *N.L.R.B. v. Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), *enf'd,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). The *Wright Line* test was upheld by the Supreme Court in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).

6. The *Wright Line* test is designed to determine, in situations in which the employer can show a

legitimate reason for taking its actions against the employee, whether the employer was motivated by the employee's union activity or affiliation.

The approach the Board adopted in *Wright Line* ... requires the General Counsel to "make a *prima facie* showing sufficient to support the inference that [the employee's participation in] the protected conduct was a 'motivating factor' in the employer's decision." Once the General Counsel establishes a *prima facie* showing, the burden shifts to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.

General Counsel established her *prima facie* case, as the facts clearly show that anti-Union animus played no role whatsoever in Gateway's decision not to rehire Dixon and Blair, and certainly do not support an anti-Union inference in Gateway's decision to rehire Hunt. Assuming that a *prima facie* case was established, however, we believe that Gateway successfully carried its burden of showing that its decision not to employ Dixon and Blair would have been made irrespective of anti-Union considerations.

### 1. *The Prima Facie Case*

■ Under *Wright Line*, the General Counsel was required to establish a *prima facie* case that Gateway's decision to discharge Hunt, Dixon and Blair was motivated, in part, by anti-Union animus. The Board found that the General Counsel made out her *prima facie* case based solely on the following facts: (1) that the three employees were discharged; (2) that a statement by Dacey, an officer of Gateway, evidenced an anti-Union motivation behind the discharge; and (3) that Gateway's March 20, 1984 letter to the Union further supported an inference of anti-Union motivation because it informed the Union that Gateway would be hiring "independent" projectionists.[7] We find the Board's opinion to be incomprehensible on this point, because the facts upon which the Board relies do not even come close to establishing a *prima facie* case.[8]

First, there is nothing sinister in Gateway's decision not to continue to take Union-referred projectionists following the termination of Gateway's agreement with the Union. It is undisputed that Gateway played no role in the selection and scheduling of projectionists under the agreement. It is also undisputed that, under Gateway's understanding of the agreement, it could not dismiss or otherwise discipline referred projectionists, but had to lodge its complaints with the Union. Gateway's course of conduct was entirely consistent with this view of the agreement. Thus, in its March 20, 1984 letter to the Union, it asked the Union to "please notify Mr. Dixon, Mr. Hunt, Mr. Blair *and any other projectionists that you had scheduled for work* this week at the Senator Theatre and Capitol Hill Cinemas" that the agreement had been terminated.[9] Moreover, as the Board found, "pursuant to the agreement, although [Gateway] had numerous disciplinary problems with projectionists, it took no action against the employees but repeatedly complained to the Union about them."[10]

■ Second, it is also undisputed that Gateway was absolutely free to terminate its agreement with the Union at any time after December 16, 1983. So, as the Board concluded, "when [Gateway] terminated its relationship with the Union on 20 March 1984, it was exercising a right created by its agreement with the Union and did not thereby violate ... the Act. Having lawfully terminated its relationship with the Union, [Gateway] was free to alter terms and conditions of employment without bargaining."[11] Indeed, once the agreement with the Union terminated, Gateway was under no obligation to employ the Union-referred projectionists. Assuming that these

---

*Passaic Daily News v. NLRB,* 736 F.2d 1543, 1552–53 (D.C.Cir.1984) (citation omitted) (quoting *Wright Line,* 251 N.L.R.B. at 1089) (language added by the court).

**7.** Board Op. at 7.

**8.** The Board also suggests in its brief that "[t]he abrupt timing of the discharges demonstrates that the discharges were the result of the Company's antiunion hostility." Brief for the NLRB at 13. We decline to consider this post hoc justification for the Board's action. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983) ("[A]n agency's action must be upheld, if at all, on the basis articulated by

the agency itself."). However, we do note that we find nothing unusual about the timing of the discharges. As discussed in Part II.A.2 *infra,* the timing is consistent with Gateway's understanding of its agreement with the Union. Accordingly, it hardly demonstrates "anti-union hostility."

**9.** Letter from Gateway to the Union (Mar. 20, 1984), *reprinted in* J.A. 726 (emphasis added).

**10.** Board Op. at 3.

**11.** *Id.* at 4–5.

projectionists were employees of Gateway,[12] the moment the agreement with the Union was terminated, the projectionists were terminable at will by Gateway.[13] Thus, on March 20, 1984, the projectionists could have been terminated for any reason at all, except, of course, for a reason that violated the Act.

We thus turn to the Board's evidence of such an improper reason—anti-Union animus. It is impossible to discern any anti-Union animus from Gateway's letter to the Union. The letter simply informed the Union of Gateway's intent to terminate the agreement, something that Gateway had a right to do. Moreover, the letter evidences a willingness to consider reestablishing a relationship with the Union, stating that "Gateway would be glad to evaluate [a realistic contract offer] and [would] respond accordingly." [14]

The Board assigns great importance to the fact that, in the letter, Gateway stated that it "ha[d] decided to employ independent projectionists for the immediate future." [15] It seems to interpret "independent" as meaning "non-Union," thus evidencing anti-Union animus in the discharge of Dixon, Hunt and Blair. It is clear, however, from both the letter itself and from the record as a whole, that "independent" meant "not referred by the Union." [16] The clearest indication of this is Gateway's offer, given within three days of the letter, to employ Hunt. There is no evidence that

this offer was conditioned on Hunt severing his ties with the Union, nor is there any evidence that Gateway sought to hire only non-Union projectionists after March 20, 1984.

The Board also relied on a statement allegedly made to Dixon by Dacey, an officer of Gateway, to demonstrate that Gateway's decision to discharge the projectionists was "rooted in its hostility toward the Union and its members" and that Gateway had conditioned their continued employment on "resignation from, or disassociation with, the Union." [17] The Board summarized this testimony as follows:

> On the evening of 20 March, projectionist Dixon—apparently not having heard of the Respondent's action—reported for his scheduled shift. According to Dixon's uncontroverted testimony, he was met outside the theater by the Respondent's vice president, Dacey, who asked Dixon why he was there. Dacey then asked Dixon whether the Union had not told him that he no longer worked at the theater. Dixon replied in the negative. Dacey then said to Dixon, "Due to your union brother, Mr. Jim Hughes, you no longer have a job," and then said, "You and Mr. Hunt are two good people.... I could use you outside the union." [18]

We do not think that Dacey's statement is sufficient, when viewed against the

---

**12.** Gateway claims that, because the choice and scheduling of projectionists were left to the Union, the projectionists were not Gateway's employees. It is undisputed, however, that the projectionists were on Gateway's payroll. We agree that, whether or not "the Union was in effect [Gateway's] agent for hiring and disciplining" the projectionists—an issue the Board never resolved, *see* Board Op. at 4 n. 5—they were certainly employees of Gateway.

**13.** It is well established that, under District of Columbia law, an employee is terminable at will in the absence of a clearly expressed intent to the contrary. *See Minihan v. American Pharmaceutical Ass'n,* 812 F.2d 726, 727 (D.C.Cir. 1987); *Sullivan v. Heritage Found.,* 399 A.2d 856, 860 (D.C.1979).

**14.** Letter from Gateway to the Union (Mar. 20, 1984), *reprinted in* J.A. 726.

**15.** *Id.*

**16.** Indeed, the General Counsel seemed to have taken this position in her Brief in Support of Exceptions filed with the Board. The General Counsel quoted testimony given at the hearing by the President of Gateway, in which he explained that the phrase "independent projectionists" meant "that they had to deal directly with us. We assigned their hours, we did their scheduling and we gave them the benefits and whatever that we decided that we would want to give and that they would be willing to accept." Transcript of Hearing before the ALJ at 441–42, *reprinted in* J.A. 552–53 (quoted in Counsel for the General Counsel's Brief in Support of Exceptions at 15, *reprinted in* J.A. 50).

**17.** Board Op. at 7.

**18.** *Id.* at 6–7.

record as a whole, to support a *prima facie* case. In particular, there is no evidence that Gateway "conditioned Dixon's and Hunt's reemployment on their resignation from, or disassociation with, the Union."[19] There is no evidence that, in filling its projectionist slots, Gateway even considered Union affiliation. Indeed, within three days of the date of Dacey's alleged statement, Gateway made an unconditional offer to hire Hunt. It is also undisputed that Dixon and Blair were incompetent and flouted Gateway's work rules.

Thus, when viewed in context, all of the facts relied on to establish a *prima facie* case of anti-Union motivation paint a wholly different picture than the one suggested by the Board. Namely, they show that, once the agreement with the Union was lawfully terminated on March 20, 1984, the projectionists became terminable at will. No longer wishing to use Union referrals, Gateway proceeded to select its own projectionists. It made an offer of continued employment to Hunt, one of the Union-referred projectionists. It declined to make offers to the other Union-referred projectionists. We find it inconceivable that these facts, particularly given the poor records of Dixon and Blair, show anything other than the actions of an employer exercising its business judgment. The Board's ruling that the General Counsel had made out her *prima facie* case of anti-Union motivation in Gateway's discharge of the projectionists is not supported by substantial evidence.

### 2. *Rebuttal of the Prima Facie Case*

■ Even assuming, *arguendo*, that the General Counsel established a *prima facie*

case, it is clear that Gateway successfully carried its burden of showing that Dixon and Blair would have been discharged irrespective of any anti-Union animus. Gateway relied on the undisputed fact that "Blair's and Dixon's repeated infractions of [its] rules [gave] it adequate cause to discharge ... them."[20] It also maintained that, as long as its agreement with the Union was in force, it could not terminate their services, but could only complain about their performance to the Union. As soon as the agreement with the Union was terminated, Gateway claimed it was then free to terminate Dixon's and Blair's services. Gateway further contended that its unconditioned offer to hire Hunt within three days after it had terminated its relationship with the Union not only rebuts the claim that Hunt was unlawfully terminated, but provides added support for its claim that its decision not to hire Dixon and Blair was based on their job performance and not on their Union affiliation.

The Board rejected Gateway's explanation, maintaining that "[Gateway] tolerated [Dixon's and Blair's] infractions for months without taking action against them and without warning them of possible discharge for their conduct, and did not require or insist that the Union take action."[21] The Board thus apparently found that Dixon's and Blair's job performance could not have been Gateway's reason for terminating their services because it had not taken strong enough action against Dixon and Blair in the past.[22] As for Hunt, the Board found that Gateway's subsequent offer to hire Hunt "does not detract from the fact that it previously had discharged him."[23]

19. *Id.* at 7.

20. *Id.* at 8.

21. *Id.*

22. We find it curious that, although the Board declined to decide whether "the Union was in effect [Gateway's] agent for hiring and disciplining employees," *id.* at 4 n. 5, and even though the Board found that "pursuant to the agreement, although [Gateway] had numerous disciplinary problems with projectionists, it took no action against the employees but repeatedly complained to the Union about them," *id.* at 3,

the Board, nonetheless, concluded that Gateway "tolerated" the actions of the projectionists. Such a conclusion has no foundation unless the agreement gave Gateway the power to dismiss or otherwise discipline the projectionists. Given that the Board never made this determination, it follows that, without more, its finding that Gateway tolerated the projectionists' actions is without support.

23. *Id.* at 9. We fail to see why an offer to rehire Hunt within three days of his discharge, not conditioned in any way on Hunt terminating his Union affiliation, does not effectively rebut any

The ultimate question in any section 8(a)(3) case is the employer's motivation. *See NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983); *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967); *Passaic Daily News v. NLRB*, 736 F.2d 1543, 1551 (D.C.Cir.1984). In this case, it is undisputed that Gateway believed (correctly or incorrectly) that, under its agreement with the Union, it had no power to refuse referrals or otherwise discipline projectionists, and that its sole remedy was to complain to the Union. *Cf. Airborne Freight Corp. v. NLRB*, 728 F.2d 357, 358 (6th Cir.1984) (per curiam) (rejecting a section 8(a)(3) claim of improper employer motivation because "rightly or wrongly, [the employee's] supervisors believed that [the employee] had deliberately falsified his timecard.... [H]is discharge [occurring as a result] was totally consistent with the Company's policy...."). It is also undisputed that Gateway in fact complained regularly to the Union about the job performance of Dixon and Blair. Thus, Gateway could hardly be said to have "tolerated" Dixon's and Blair's admittedly sub-par job performances. Moreover, it is clear that, under Gateway's understanding of the agreement, the Union functioned as a supplier of projectionist services, and that Gateway, although it paid the projectionists directly, did not view them as "employees."[24] Ac-

cordingly, it was entirely consistent with its understanding of the agreement for Gateway to view its obligations to Union-referred projectionists as being terminated when the agreement with the Union was terminated. Thus, the "discharge" of the three projectionists was a natural consequence of the termination of the agreement. This is further evidenced by Gateway's almost immediate offer to hire Hunt. The only rational explanation for Gateway's offer to employ Hunt and not to employ Dixon and Blair is that Hunt was a competent projectionist whereas the other two were not. On the facts of this case, it cannot be found that Gateway was motivated by anti-Union animus.

### B. *The Section 8(a)(1) Violation*

■ The Board also found that the aforementioned statement by Dacey was "coercive," and therefore was violative of section 8(a)(1) of the Act. The Board explained:

> Dacey's statements to Dixon indicate both that the Respondent conditioned Dixon's and Hunt's reemployment on their resignation from, or disassociation with, the Union, and that the Respondent's decision to discharge the projectionists was rooted in its hostility toward the Union and its members. Clearly, such statements had a tendency to restrain and coerce Dixon in the exer-

claim that Hunt's discharge was due to his Union affiliation.

**24.** Although the Board declined to reach this issue, *see* Board Op. at 4 n. 5, the ALJ found "the analogy to a contractor [to be] undisputable." ALJ Op. at 6. Indeed, the actions of the parties provide a strong inference that Gateway did not exert the control over the selection and scheduling of projectionists that would typically be associated with an employer-employee relationship. *See, e.g., id.* at 5 ("[T]he Union would decide who was to work on any given day."). This is shown graphically in the March 20 letter from Gateway to the Union in which it asked the Union to "please notify Mr. Dixon, Mr. Hunt, Mr. Blair *and any other projectionists that you had scheduled for work this week* at the Senator Theatre and Capitol Hill Cinemas" that their services were no longer needed. Letter from Gateway to the Union (Mar. 20, 1984), *reprinted in* J.A. 726 (emphasis added). More-

over, in its charge filed with the Board, the Union named as one of the discharged employees a projectionist, Marken, who had not worked at a Gateway theater in more than a month before March 20. *See* Board Op. at 5 n. 6. The Union included Marken in its charge because it "planned to refer Marken back to one of [Gateway's] theaters," and because Marken had only left his position with Gateway temporarily. *Id.* These facts clearly show that the decision as to which projectionists were to be assigned to Gateway's theaters in any given week was left in the hands of the Union, and that Gateway's position that the projectionists were not its "employees" was consistent with the parties' practices under the agreement. Although not dispositive of the issue of whether or not the projectionists were Gateway's employees, *see* note 12 *supra*, these facts are relevant to understanding Gateway's motives in discharging all of its projectionists, including Hunt, on March 20, 1984.

cise of his statutorily protected rights. Accordingly, we find that the Respondent violated Section 8(a)(1) of the Act by Dacey's 20 March 1984 statements of [sic] employee Dixon.[25]

Once again, we find the Board's findings unsupported by substantial evidence. As discussed above, even assuming that the statement was made, we fail to see how the evidence, considered as a whole, supports the view that Gateway conditioned the employment of *any* projectionist on "resignation from, or disassociation with, the Union." Dacey's reference to "outside the union" is clearly a paraphrase of Gateway's statement in its March 20 letter indicating that it would be employing "independent projectionists." This relates to the practice, under the agreement, of employing Union-referred projectionists. It does not express any attempt to limit hiring to non-Union projectionists, nor does the record show that Gateway ever had a practice of hiring only non-Union projectionists. Moreover, there is no indication in the record that Gateway ever entertained the idea of keeping Dixon on as a projectionist

after it terminated its arrangement with the Union, whether or not Dixon was willing to break his ties with the Union. On the contrary, all the evidence suggests that Gateway was glad to finally rid itself of a poor projectionist.

### III. CONCLUSION

There is a clear lack of factual information and common sense underlying the Board's decision in this case. This court takes a deferential posture in reviewing judgments of the Board; however, in order to be upheld, Board findings must be supported by substantial evidence based on the record considered as a whole. The Board's judgments in this case find no support in the record.

*Enforcement denied.*

---

**25.** Board Op. at 7.