John KAHN, Petitioner,

v.

UNITED STATES SECRETARY
OF LABOR, Respondent,

and

Commonwealth Edison Company,
Intervening Respondent.

No. 94–3751.

United States Court of Appeals,
Seventh Circuit.

Argued May 31, 1995.

Decided Aug. 24, 1995.

As Modified Sept. 7, 1995.

Stephen M. Kohn, Veronica Leon (argued), Kohn, Kohn & Colapinto, Washington, DC, for John Kahn.

Jon I. Fieldman, Sidley & Austin, Chicago, IL, John H. Secaras, Sol. Gen., Dept. of Labor, Chicago, IL, Joan Brenner (argued), Monica Gallagher, William J. Stone, Thomas S. Williamson, Jr., Dept. of Labor, Office of Sol., Washington, DC, for Dept. of Labor.

Glenn D. Newman, Carolyn Kohn Winick (argued), Commonwealth Edison Co., Chicago, IL, for Commonwealth Edison Co.

Before POSNER, Chief Judge, RIPPLE, Circuit Judge, and NORGLE, District Judge.*

---

* The Honorable Charles R. Norgle, Sr., United States District Judge for the Northern District of Illinois, sitting by designation.

1. Kahn had been hired and assigned to the Zion station because the station had been placed on the "watch" list by the Nuclear Regulatory Commission. Nuclear power facilities are placed on

NORGLE, District Judge.

Commonwealth Edison ("ComEd") constructively discharged John Kahn ("Kahn"), a Quality Control Auditor assigned to its Zion, Illinois, nuclear station. Kahn claims that this termination violated the Energy Reorganization Act ("ERA" or the "Act"), 42 U.S.C. § 5851, which protects so-called "whistleblowers" from discrimination due to their employment-related activities. After a hearing, an Administrative Law Judge ("ALJ") concluded that the dismissal of Kahn was for lawful reasons not prohibited by the Act. The Secretary of Labor adopted and affirmed the ALJ's decision. Since the Secretary's decision is supported by substantial evidence in the record, we affirm.

## I.

ComEd first hired Kahn on July 8, 1991. Kahn worked as a Quality Control Auditor and was assigned to the Zion, Illinois, nuclear power plant.[1] ComEd hired Kahn to perform safety-related audits to determine whether ComEd operated its nuclear plant in accordance with its own safety requirements and those of the Nuclear Regulatory Commission ("NRC"). Kahn was required to report violations of such regulations to his superiors and other coworkers. On Kahn's first day, he conducted himself in a sarcastic, argumentative, and condescending manner towards another employee, Susan White[2] ("White"). White would later complain to her boss of Kahn's conduct. Several days after beginning at the plant, when Kahn inquired about a delay in receiving his first paycheck, Kahn displayed a loud, abusive, and belligerent demeanor. Cheryl Orsini ("Orsini") complained of this behavior to her assistant manager. As a result of Kahn's unruly behavior, David Bump ("Bump"), Kahn's immediate supervisor, counseled him regarding the impropriety of his conduct toward White and Orsini. Kahn reacted to the

the list if they are determined to be a "problem plant." Brief of Petitioner, p. 3 (citing ALJ Hearing Transcript, p. 22).

2. White was responsible to "process Kahn in" after he arrived at the Zion facility.

counselling by shifting the blame to Orsini and stating that he did not appreciate the "kangaroo court."

Later that month, a third coworker, Kathy Wagner ("Wagner"), complained to her superiors that Kahn had, on several occasions, used suggestive and lewd language with her and touched her in an inappropriate manner. Kahn was then advised by the human resources supervisor, Norman Breseman ("Breseman"), that such conduct was in violation of company policy against sexual harassment. Breseman warned Kahn that a subsequent similar occurrence could lead to his discharge. Kahn admitted in his testimony before the ALJ that he had touched Wagner and that Breseman warned him about his conduct toward Wagner.

On October 16, 1991, Kahn received his first performance evaluation. Bump checked the "fully meets expectations" box, but testified that he did so even though he still had lingering concerns about the complaints regarding Kahn. Bump explained that he gave Kahn "the benefit of the doubt" since the three episodes occurred in "a three-week time frame when [Kahn] first started" and because two months had elapsed since the complaints.

■ In mid-March 1992, Kahn made a total of five "internal"[3] complaints regarding violations of safety procedures and NRC regulations. First, Kahn advised Bump, the Nuclear Quality Program superintendent, of what he perceived to be improper handling of nuclear fuel bundles prior to a "smear test" to determine radiation contamination. Second, Kahn advised Williams, his supervisor, of an alleged storage problem. Kahn complained that certain materials were stored in an uncontrolled environment rather than stored in the required temperature and humidity levels. Third, Kahn made complaints

to Bump regarding his disagreement with a ComEd policy. ComEd had a policy of keeping track of all employee violations in each of the violators' personnel files. Kahn believed that this policy discouraged cooperation with safety audits. Fourth, Kahn notified Robert Whittier ("Whittier") of his opinion that the auditors should use more reliable means of reporting audit observations, as opposed to using ComEd's Field Monitoring Reports. Finally, Kahn advised Whittier that he thought the questions used in the audits were outmoded.

Also in March 1992, Bump began receiving additional complaints relating to Kahn. Bump learned that Kahn was working overtime without obtaining the necessary approval. Kahn admitted in the hearing before the ALJ that he knew that he was supposed to secure permission for such overtime. Bump also received complaints that Kahn was abrasive and aggressive with workers whose organizations he was auditing. Other complaints questioned the thoroughness of some of his investigations. As a result of the complaints, Bump counseled Kahn on March 11, 1992. In response, Kahn blamed the conduct on the "undue resistance" of the audited organizations. Bump investigated the alleged resistance, but found that other auditors had not encountered the alleged resistance.

Later in March, Kahn was assigned to work on an audit. Whittier was the team leader of the audit. Before the audit, Whittier met with the entire audit team, advised each team member of his individual responsibilities, and then met with each worker separately. In this separate meeting, Whittier authorized Kahn to work up to four hours of overtime, if necessary, to complete a specific activity. Whittier also expressed to Kahn that Kahn must complete the assignment by March 31, 1992. Yet, on March 31, Kahn

3. An internal complaint is one lodged with a supervisor of the company itself. An external complaint is one lodged with an outside agency, such as the Nuclear Regulatory Commission. Although the Energy Reorganization Act, as amended, specifically includes internal complaints as protected, the Act as it stood in April 1992 did not expressly include such complaints within the definition of protected activity. The Act spoke only of external complaints. However,

the Secretary of Labor has regularly viewed such complaints as protected under the Act. Other circuits have agreed. See *Kansas Gas & Elec. Co. v. Brock*, 780 F.2d 1505, 1510–12 (10th Cir. 1985); *Mackowiak v. University Nuclear Systems, Inc.*, 735 F.2d 1159, 1162–63 (9th Cir.1984). *But see Brown & Root, Inc. v. Donovan*, 747 F.2d 1029, 1036 (5th Cir.1984) (holding that such internal complaints are not protected acts under the ERA.)

had not completed the assigned work. Moreover, although Kahn had worked the full four hours of authorized overtime, the overtime had not been spent on the specified activity.

On April 2, 1992, Whittier asked Kahn for an explanation for Kahn's failure to complete the assigned work. Kahn reacted with loud, verbal abuse and two pokes to Whittier's chest. Whittier, in turn, used similar loud and offensive language. Russell Williams ("Williams") testified that, at the same time Whittier confronted Kahn, he was *en route* to ask Kahn why he had worked the overtime. As he approached Kahn's cubicle, Williams heard Kahn using foul language. Kahn later admitted that he had used "four-letter words," touched Whittier, and had been upset.

The entire incident was reported to Bump, who at the time was out of town. Bump requested Whittier, Williams, and a coworker who had witnessed the confrontation to document what had happened. On his return, Bump reviewed their reports. On April 14, 1992, Bump had a discussion with Whittier, Williams, the coworker, and his supervisors regarding the incident, as well as Kahn's entire work history with ComEd.

Kahn's supervisors, Bump and Ron Roman ("Roman"), and Rick Erwin ("Erwin"), a supervisor of the Industrial Relations Department, then met with Kahn to allow him to tell his version of the incident. Kahn was told at this meeting that ComEd was considering discharging him. After the meeting, the supervisors decided that Kahn should be terminated due to the number of incidents of unacceptable behavior in the ten months Kahn was employed with ComEd. ComEd offered Kahn the choice between resignation or termination. Kahn later resigned. After Kahn's departure, he reported safety concerns to the NRC.

On May 12, 1992, Kahn filed a complaint with the Secretary of Labor alleging that ComEd terminated him in violation of the Energy Reorganization Act ("ERA"). The ALJ conducted a hearing on December 9 and 10, 1992, at which eight of Kahn's former coworkers and supervisors testified. All eight ComEd employees had something negative to say regarding Kahn's ability to interact with other people, an integral part of an auditor's performance. Two coworkers, Darlene Murphy ("Murphy") and Syed Jaffery ("Jaffery"), also testified. Murphy stated that, in her opinion, Kahn could have conducted "certain aspects of his job" without "upsetting everybody," and that, at times, Kahn was not helpful "to [the] auditing mission." Jaffery testified that Kahn had "a very short temper" which effectually hindered both Kahn and Jaffery in the performance of their audit duties. Bump and Erwin, two of the three supervisors involved in the decision to terminate Kahn, testified that the dismissal was triggered solely by Kahn's conduct.

On February 24, 1993, following the two day hearing, the ALJ issued a recommendation order dismissing Kahn's complaint. The ALJ found that although Kahn had made complaints of safety hazards protected by the ERA, it was not because of these complaints that he was fired. To the contrary, the ALJ concluded that the behavior and conduct of Kahn had been the sole reason for his discharge.

On October 3, 1994, the Secretary of Labor ("Secretary") issued his decision and order adopting the ALJ's recommendation. The Secretary found that Kahn had established a *prima facie* case, but that he failed to prove that ComEd's legitimate, non-discriminatory reason for terminating him was pretextual. Accordingly, the Secretary dismissed the complaint. Kahn appealed. We affirm.

## II.

The court has jurisdiction pursuant to 42 U.S.C. § 5851(c). This section states, in pertinent part, that "[a]ny person adversely affected or aggrieved by an order issued [by the Secretary of Labor] ... may obtain review of the order in the United States Court of Appeals for the circuit in which the violation, with respect to which the order was issued, allegedly occurred." 42 U.S.C. § 5851(c)(1). Kahn alleges that ComEd unlawfully terminated him while he was assigned to the Zion, Illinois, nuclear power plant. Because the alleged violation of the Energy Reorganization Act occurred within

this circuit, we have jurisdiction to review the Secretary of Labor's final order.

■ In reviewing cases arising under the ERA, we are required to conform to the standard of review set forth in the Administrative Procedure Act. 42 U.S.C. § 5851(c)(1). Thus, we may overturn the Secretary's decision only if we find that it "is unsupported by substantial evidence or if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A), (E); *Lockert v. United States Dept. of Labor,* 867 F.2d 513, 516–17 (9th Cir.1989). Substantial evidence is that which is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "Substantial evidence may be less than a preponderance of the evidence, . . . and a reviewing body may not set aside an inference merely because it finds the opposite conclusion more reasonable or because it questions the factual basis." *Freeman United Coal Mining Co. v. Stone,* 957 F.2d 360, 362 (7th Cir.1992) (quoting *Smith v. Director, OWCP,* 843 F.2d 1053, 1057 (7th Cir.1988)).

When reviewing the Secretary's final decision, we are mindful that "where Congress has made an explicit or implicit grant of power to an agency over certain matters, [such as review of claims arising under the ERA], that grant of power embodies congressional recognition of the agency's 'special competence' to handle those matters, and compels deference from the courts in reviewing how that power is exercised." *National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1569–70 (D.C.Cir.1986) (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)); *see also NLRB v. Local 554, Graphic Communications Int'l Union, AFL–CIO,* 991 F.2d 1302, 1304 (7th Cir.1993) (giving "substantial deference" to National Labor Relations Board because "Congress delegated to the Board primary responsibility for developing and applying national labor policy").

### III.

#### A. *The Energy Reorganization Act*

Kahn alleges that he was unlawfully terminated on April 14, 1992, and subsequently filed his complaint with the Secretary of Labor on May 12, 1992. Thus, we must look to the Energy Reorganization Act as it stood during that time period.[4] The Act stated, in pertinent part, as follows:

> No employer, including a Commission licensee, an applicant for a Commission license, or a contractor or a subcontractor of a Commission licensee or applicant, may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee)—
>
> (1) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter or the Atomic Energy Act of 1954, as amended [42 U.S.C. 2011 et seq.], or a proceeding for the administration or enforcement of any requirement imposed under this chapter or the Atomic Energy Act of 1954, as amended;
>
> (2) testified or is about to testify in any such proceeding or;
>
> (3) assisted or participated or is about to assist or participate in any manner in such a proceeding or in any other manner in such a proceeding or in any other action to carry out the purposes of this chapter or the Atomic Energy Act of 1954, as amended [42 U.S.C. 2011 et seq.].

42 U.S.C. § 5851(a)(1)–(3). Congress added this § 5851 to the Act in 1978. The related Senate report states:

> This amendment is substantially identical to provisions in the Clean Air Act and the Federal Water Pollution Control Act. The legislative history of those acts indicated that such provisions were patterned after the National Labor Management Act and a

---

4. Congress made several amendments to the Act     effective October 24, 1992.

similar provision in Public Law 91–173 (FMSA) relating to the health and safety of the Nation's coal miners.

S.Rep. No. 84, 95th Cong., 2nd Sess. at 29, 1978 U.S.Code Cong. & Ad.News at 7303. The provisions of § 5851 serve to protect workers "from retaliation based on their concerns for quality and safety." *Mackowiak v. University Nuclear Sys., Inc.,* 735 F.2d 1159, 1163 (9th Cir.1984). Both the ERA's legislative history [5] and NRC regulations [6] are evidence of this purpose. *Kansas Gas & Elec. Co. v. Brock,* 780 F.2d 1505, 1512 (10th Cir. 1985).

*B. Standard for Proving Discrimination*

■ Both the ALJ and the Secretary of Labor utilized the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) for defining the burdens in proving "whistleblower" discrimination. This circuit has yet to determine the applicable burden allocations in a retaliatory discharge case arising under the Energy Reorganization Act. While the *McDonnell Douglas* method of proving discrimination, commonly known as the burden-shifting or inferential method, was originally created to address actions arising under the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* this circuit utilizes the method in discrimination claims arising under other Congressional acts. *See Giacoletto v. Amax Zinc Co., Inc.,* 954 F.2d 424 (7th Cir.1992) (using the method in a case regarding the Age Discrimination in Employment Act). We see no reason why the method prescribed by *McDonnell Douglas* should not be employed in "whistleblower" retaliation claims as well.[7]

■ There are three phases to the burden-shifting method. In the first phase, the burden rests squarely on the employee. The employee can create an inference of discrimination by establishing a *prima facie* case. A *prima facie* case is established when the employee shows four elements: "(1) the employer is governed by the [Energy Reorganization] Act; (2) the employee engaged in protected activity as defined in the Act," *Bechtel Construction Co. v. Secretary of Labor,* 50 F.3d 926, 933–34 (11th Cir.1995) (citing 42 U.S.C. § 5851); (3) the employee's subsequent discharge; and (4) a nexus exists between the protected activity and the discharge. *Simon v. Simmons Foods, Inc.,* 49 F.3d 386, 389 (8th Cir.1995) (citing *Couty v. Dole,* 886 F.2d 147, 148 (8th Cir.1989)). "Proximity in time is sufficient to raise an inference of causation." *Bechtel,* 50 F.3d at 934 (citing *Couty,* 886 F.2d at 148).

The employee's burden of satisfying the four elements of a *prima facie* case is not onerous; rather, a *prima facie* showing is "quite easy to meet." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Villanueva v. Wellesley College,* 930 F.2d 124, 127 (1st Cir.1991). The establishment of a *prima facie* case creates a rebuttable presumption that the employer's decision to terminate the employee was the result of impermissible factors in violation of the

**5.** "Any worker who is called upon to testify or who gives information with respect to an alleged violation of the Atomic Energy Act or a related law by his employer or who files or institutes any proceeding to enforce such law against an employer may be subject to discrimination. This section would prohibit any firing or discrimination and would provide an administrative procedure under which the employee or his representative could seek redress for any violation of this prohibition." S.Rep. No. 848, 95th Cong., 2nd Sess. at 29, U.S.Code Cong. & Admin.News 1978, pp. 7303, 7304.

**6.** "Employees are an important source of such information and should be encouraged to come forth with any items of potential significance to safety without fear or retribution from their employers. The purpose of [§ 5851] is to ensure that employees are aware that employment discrimination for engaging in a protected activity ... is illegal and that a remedy exists throughout the Department of Labor. The organizations subject to the rule should understand that the Commission will not permit any interference with communications between the Commission's representatives and employees of such organizations." 55 Fed.Reg. 10397, 10402 (March 21, 1990).

**7.** "Whether or not the Secretary's use of the [*McDonnell Douglas*] test is 'required by the Act, [it] is at least permissible under it ..., and in these circumstances [the Secretary's] position is entitled to deference.'" *Mackowiak,* 735 F.2d at 1164 (quoting *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 402–04, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983)).

ERA. *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1144–45 (7th Cir.1994).

Once an inference of retaliation is created, the burden shifts to the employer to "articulate a legitimate, [nondiscriminatory] reason for the discharge." *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 336 (7th Cir.1993). In this second phase, if there is no evidence that dual motives exist, the employer need not persuade the court; the burden is simply one of production. *St. Mary's Honor Center v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden of proof remains on the employee at all times. *Id.* However, "once the plaintiff has shown that the protected activity 'played a role' in the employer's decision," *Mackowiak*, 735 F.2d at 1163–64, "the employer has the burden to prove by a preponderance of the evidence that it would have terminated the employee even if the employee had not engaged in the protected conduct." [8] *Passaic Valley Sewerage v. United States Dep't of Labor*, 992 F.2d 474, 481 (3rd Cir.1993) (citing *Mt. Healthy City School Dist. Bd. of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)).[9] Once the employer satisfies his burden, either of persuasion or production, the rebuttable presumption is dissolved. *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir.1994). The employee is then required to prove that the employer's proffered reason for the termination is a mere pretext for an unlawful discharge. *Fisher v. Transco Serv. Milwaukee, Inc.*, 979 F.2d 1239, 1243 (7th Cir.1992).

In both dual motives and burden-shifting cases, the employee must prove that the lawful justification for the termination was "phony." *McKennon v. Nashville Banner Publishing*, —— U.S. ——, —— – ——, 115 S.Ct. 879, 884–85, 130 L.Ed.2d 852 (1995) (citing *Mt. Healthy*, 429 U.S. 274, 284–87, 97 S.Ct. 568, 574–76, 50 L.Ed.2d 471 (1977)).

To meet the burden of persuasion in the third phase, the plaintiff need not produce direct evidence to contradict the employer's purported reason. *Bechtel*, 50 F.3d at 934. Rather, the employee may simply persuade the trier of fact "by establishing either that the unlawful reason, the protected activity, more likely motivated [the employer] or that the employer's proffered reason is not credible and that the employer discriminated against him." *Id.* "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible ... [rather,] he must show that the explanation is a 'phony reason.' " *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir.1994).

■■■ It is clear that Kahn established a *prima facie* case of retaliatory discharge. As both the Secretary of Labor and the ALJ noted, there is no dispute as to the first and second elements. ComEd is an employer subject to the ERA, and Kahn is an employee of ComEd. Furthermore, the third and fourth elements exist as well. Kahn was constructively discharged from employment on April 14, 1992. This discharge occurred less than a month after he made internal safety-related complaints to his supervisors pursuant to his job requirements as a Quality Control Auditor, and, therefore, the proximity of time between his protected activities and his discharge creates an inference of unlawful termination.

■■■ Since Kahn properly established a *prima facie* case, the burden then shifts to the employer, ComEd. Neither the Secretary of Labor nor the ALJ concluded that Kahn effectively proved that his protected activities "played a role" in his termination. Rather, both held that Kahn simply created an inference. Therefore, the Secretary employed the *McDonnell Douglas* method, involving a defendant's mere burden of production, as opposed to the *Mt. Healthy* dual

---

**8.** In cases in which the employee has proven that the employer had an illegal motive to discharge him, the burden of proof fairly rests upon the employer. In that case, "[t]he employer is a wrongdoer; the employer has acted out of a motive that is declared illegitimate by the statute. It is fair that he bear the risk that the influence of legal and illegal motives cannot be separated, because ... the risk was created by his own wrongdoing." *NLRB v. Transportation Manage-*

*ment Corp.*, 462 U.S. at 402–04, 103 S.Ct. at 2475.

**9.** The Supreme Court has previously given its approval to the use of the dual motive discharge test in cases arising under similar acts, such as the National Labor Relations Act. *NLRB*, 462 U.S. at 402–04, 103 S.Ct. at 2475.

motive method, which places a much greater burden, a burden of persuasion, upon the defendant. The Secretary determined that ComEd met the burden of production by "outlining Kahn's abusive and inappropriate behavior toward White, Orsini, Wagner, and Whittier." ComEd asserted Kahn's belligerent and improper conduct towards his co-workers and supervisors as the legitimate, non-discriminatory reason for his termination. ComEd was not required to substantiate the simple assertion. The mere articulation of a lawful reason for Kahn's firing satisfies the employer's burden.

Kahn contends that ComEd's proffered reason is not a lawful reason. According to Kahn, ComEd is in violation of the ERA if it fires any Quality Control Auditor who "creates friction in his relation with coworkers and superiors" since such friction inherently arises due to the nature of Kahn's job. Since "conflicts between such auditors and other employees are common at nuclear facilities," Kahn argues, the termination of a "whistle-blower" employee for such conflicts is an unlawful reason. Thus, Kahn contends that ComEd failed to proffer a legitimate reason for his termination, and the inference of unlawful discrimination remained unrebutted.

■■■ We find Kahn's argument unpersuasive. Kahn's attempt to hide behind his protected activity as a means to evade termination for non-discriminatory reasons is flawed. The cases to which Kahn cites, *Kansas Gas & Elec. Co. v. Brock,* 780 F.2d 1505 (10th Cir.1985), *Mackowiak,* and *Giacoletto v. Amax Zinc Co., Inc.,* 954 F.2d 424 (7th Cir. 1992), do not stand for the proposition that an employer may not discharge an employee for poor behavior or for rude and uncommunicative conduct as Kahn suggests. Rather, these three cases involve a trier of fact's conclusion that the purported behavioral reasons proffered by the employer as a legitimate, non-discriminatory reason for discharge were pretextual. Such is not the case here. We have consistently held that an employee's insubordination toward supervisors and coworkers, even when engaged in a protected activity, is justification for termination. *Sullair P.T.O., Inc. v. NLRB,* 641 F.2d 500, 502–04 (7th Cir.1981) (shouting vul-

garities towards management warrants discharge); *NLRB v. Truck Drivers, Oil Drivers, Etc.,* 630 F.2d 505, 508–09 (7th Cir.1980) (distributing a letter "to the employer's executive board during a political luncheon for Chicago's then mayor to the potential embarrassment of their employer" justifies termination). Moreover, communication made in the form of threats of violence or insubordination, during the course of otherwise protected activity, is removed from protection. *See Florida Steel Corp. v. NLRB,* 529 F.2d 1225, 1234 (5th Cir.1976); *Corriveau & Routhier Cement Block, Inc. v. NLRB,* 410 F.2d 347, 350 (1st Cir.1969). "[T]he rights afforded to the employee" are a shield against employer retaliation, not a sword with which one may threaten or curse supervisors." *Id.*

■■■ Certainly Congress did not intend "to tie the hands of employers in the objective selection and control of personnel" in enacting various laws proscribing employment discrimination. *Hochstadt v. Worcester Foundation,* 545 F.2d 222, 231 (1st Cir.1976). It is well-settled in this circuit and other circuits that an employer may terminate an employee for any reason, good or bad, or for no reason at all, as long as the employer's reason is not proscribed by a Congressional statute. *NLRB v. Knuth Bros., Inc.,* 537 F.2d 950, 954 (7th Cir.1976); *Ad Art, Inc. v. NLRB,* 645 F.2d 669, 679 (9th Cir.1981). No such statute proscribes the discharge of an employee who exhibits inappropriate behavior while on the job. As such, ComEd's proffered reason is both legitimate and non-discriminatory. Therefore, the inference of discrimination is dissolved.

■■■ Yet, this does not end the discussion. We next address whether there was substantial evidence to support the Secretary's determination that ComEd's proffered reason for terminating Kahn was the true reason. In support of his conclusion, the Secretary unequivocally stated that "[t]he evidence of record overwhelmingly supports the reason [ComEd] gave for discharging Kahn, his inappropriate behavior and language toward co-workers, which culminated in the shouting and poking incident with his team leader, Whittier." (Decision and Order of Secretary of Labor, at 6). In further

support of his conclusion, the Secretary adopted the ALJ's "voluminous evidence indicating that [ComEd] constructively discharged Kahn because of his behavior and not for reasons proscribed by the ERA." (Decision and Order of Secretary of Labor, at p. 7). The ALJ and Secretary pointed to the following events, all of which lead to Kahn's termination: (1) Kahn's "sarcastic, argumentative, and condescending" behavior towards White; (2) Kahn's "loud and abusive demeanor" towards Orsini; (3) Kahn's non-consensual and "inappropriate touching" of Wagner, in addition the various suggestive comments and unwanted sexual advances; (4) Kahn's abrasive and aggressive manner in which he associated with workers whose organizations he was auditing; (5) complaints of less-than-thorough investigations by Kahn; (6) Kahn's use of unauthorized overtime; and (7) Kahn's "admitted and witnessed outburst and use of foul language with Whittier," coupled with unconsented and unwarranted touching of Whittier's person. This evidence clearly amounts to substantial evidence. The evidence is much more than a "mere scintilla" and certainly represents that amount from which a reasonable person could conclude that Kahn was terminated due to his abrasive, belligerent, and antagonistic conduct rather than the protected activities in which he was engaged.[10]

Kahn further contends that since ComEd condoned Kahn's inappropriate behavior, it waived its reliance on that behavior to justify Kahn's termination. This argument is based on inaccurate facts. Kahn claims that his supervisors "never even communicated [to him] that the behavior problems alleged to have occurred during those incidents were a problem." (Brief of Petitioner, at 19.) Not so; both the Secretary and ALJ cite to numerous times when Kahn was counselled for his inappropriate and obnoxious behavior. Moreover, Kahn argues that the October 16, 1991 performance review included a "Fully Meets Expectations" rating and stated that Kahn's "performance and behavior consistently achieve[d] expected levels of performance." (Brief of Petitioner, at 19). Thus, according to Kahn, ComEd cannot terminate him for any incidents that occurred prior to the date of the performance review. This argument is patently irrational and without merit. As already stated, an employer may fire an employee for any reason at all, as long as the reason does not violate a Congressional statute.[11] Even taking this erroneous argument as true, the termination was, for the most part, due to the incident with Whittier which occurred more than five months after the performance review. Therefore, even if we were to adopt the "waiver and condonation" theory, which we do not, Kahn's argument would still fail.

■■■ Our role as a court of review is clear. "We do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how highhanded its deci-

---

10. At oral argument, Kahn's attorney contended that the ALJ and Secretary of Labor should have made their findings of fact in light of other whistleblower cases. However, case law has no effect on a finding of fact. Facts are independent of any legal standard. No amount of cases can dispute the simple fact that an employee must comply and accede to the requirements of his employer.

11. On page 17 of his brief to this court, Kahn includes a quote from In Re Gateway Theatre Corporation, 277 NLRB No. 186, 1986 WL 53731 (1986). The National Labor Relations Board found that the employer had tolerated the misconduct of two employees and that the employer should be estopped from using such misconduct to discharge the employees. However, the D.C. Circuit quickly reversed the Board's decision and refused to enforce the NLRB order. The circuit court stated that it was "utterly astonished that

the Board found violations of the Act", NLRB v. Gateway Theatre Corp., 818 F.2d 971, 972 (D.C.Cir.1987), and that there was no support for the finding that the employer ever tolerated the employees' previous misconduct. Id. at 977 n. 22. The court further stated that the employer was justified in relying upon the misconduct as a basis for discharge. Id. None of the other cases to which Kahn cites, Philips Industries, Inc., 295 NLRB No. 75, 1989 WL 224175 (1989), HS Healthcare, Inc., 295 NLRB No. 2, 1989 WL 224093 (1989), and Churchill's Supermarkets, 285 NLRB No. 21, 1987 WL 89815 (1987), concern the "waiver and condonation" rule as suggested by Kahn. Further, these cases are distinguishable in that they involved a discharged employee who was discharged for conduct exhibited by many other employees. Thus, in those cases, the employees were singled out and charged with violations of various work rules which were not enforced against others.

sional process, no matter how mistaken the firm's managers, [the Energy Reorganization Act] does not interfere." *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992) (citations omitted). Rather, our inquiry is restricted to whether the Secretary of Labor's finding that ComEd proffered an honest, legitimate, non-discriminatory reason for Kahn's termination is supported by substantial evidence. We find that it is. We also find no indication that the Secretary's decision is arbitrary, capricious or that the Secretary abused his discretion in any way. Accordingly, we affirm.